In the Matter of CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY, Debtor.

Appeal of SHEARSON LEHMAN BROTHERS, INC.

No. 86-3141.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1987.

Decided March 16, 1988.

---

Keith F. Bode, Jenner & Block, Chicago, Ill., for appellant.

Phil C. Neal, Neal, Gerber & Eisenberg, Chicago, Ill., for appellee.

Before BAUER, Chief Judge, and CUDAHY and POSNER, Circuit Judges.

CUDAHY, Circuit Judge.

This is an appeal by Shearson Lehman Brothers, Inc. ("Shearson"), an investment banker, from the denial of an application for additional compensation by the district court sitting in reorganization proceedings. We reverse with respect to the denial of all additional compensation. We conclude that additional compensation may be awarded to the extent of the $1,000,000 earlier agreed upon by Shearson and the trustee in bankruptcy. In this connection, we do not accept the determination by the district court that Shearson deliberately misled a special master by withholding documents.

I.

Shearson was retained by the trustee, Richard B. Ogilvie, in November 1979 as financial adviser in the reorganization of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (the "Railroad"). Shearson agreed, for a fee based on an hourly rate, to assist the trustee in implementing reorganization plans for the Rail-

road, in negotiating with creditors and in selling portions of the Railroad.

During the time that it was retained by the trustee, Shearson also assisted the trustee in preparing a 1979 plan of reorganization, advised him with respect to the abandonment of certain railroad lines, sought prospective purchasers for the remaining "core,"[1] made a successful tender offer for mortgage bonds and secured the retirement of debt owed the government on terms favorable to the Railroad. During this period, Shearson also assisted in the sale of the Railroad's timberlands, a transaction for which it was separately compensated. This sale contributed to the success of the Railroad's reorganization by providing it with much needed cash.

In the fall of 1981 the Grand Trunk Corporation (the "Grand Trunk") became interested in acquiring the core assets of the Railroad. The Grand Trunk made an offer for the core in May 1982, and it signed a purchase agreement in August 1982. According to the agreement, the Grand Trunk would assume $400,000,000 in liabilities of the Railroad but would pay no cash.

In early 1982, when it had become clear that the Grand Trunk would make an offer, Shearson sought to renegotiate its method of compensation.[2] In this connection, the trustee eventually agreed to change the basis of Shearson's compensation and, in September 1982, submitted to the district court a new written agreement with Shearson. The CMC Real Estate Corporation ("CMC"), the parent holding company of the Railroad, objected to this application for modification of the fee. Several hearings were held during the period September 1982 through January 1983. On December 29, 1982, Shearson executed a let-

---

1. In 1979 a special master had concluded that the Railroad could not be reorganized as a single system. Instead, segments could be sold to third parties, while the "core," a system of rail trackage in the midwest (approximately one-third of the Railroad's original trackage), could be reorganized into a viable rail carrier.

2. Shearson sought to renegotiate its method of compensation for three reasons: (1) its regular practice was to receive a flat retainer or per-

centage transaction fee rather than hourly rate compensation; (2) the average hourly rate it received ($133) was significantly lower than its normal fees for services; and (3) the Grand Trunk's offer to purchase the core assets of the railroad indicated the likelihood of a sale, which was a transaction separate from the regular advisory activities envisioned by Shearson when it was first retained.

ter to the trustee describing its agreement with him (the "1982 agreement").

Under the terms of the 1982 agreement, the trustee engaged Shearson to review the Railroad's assets and capital structure, to assist in developing a reorganization plan and in negotiating the sale of the Railroad and to provide general financial advice and broker services.[3]

In return for Shearson's services, the trustee agreed to pay $100,000 per quarter, retroactive to June 1, 1982, and to reimburse Shearson for its expenses. In addition,

> [u]pon satisfactory conclusion of the [Shearson] engagement hereunder and in the event that the Court finds that the retainer compensation [of $100,000 per quarter] ... does not fairly and adequately compensate [Shearson] for its services to the Estate during the course of the reorganization proceedings, the Trustee agrees to pay [Shearson] an additional fee, not to exceed $1,000,000, in an amount to be negotiated in good faith by the Trustee and [Shearson] and subject to approval by the Court. This further fee is intended to compensate [Shearson] for the benefit to the Estate from its services during the course of the reorganization proceedings but which is not reflected in the retainer compensation.

Appendix of Appellant at 90. Further, the agreement contained a provision that it could not be amended or modified except in writing and subject to court approval.

Following hearings on the issue whether Shearson was entitled to additional funds, the district court (Judge McMillen) approved the fee agreement by written order, finding the terms of the agreement "fair and reasonable and ... in accordance with the normal practice of the investment banking industry." *In re Chicago, Milwaukee, St. P. & Pac. R.R.*, No. 77 B 8999 (N.D.Ill. Jan. 10, 1983). Thereafter, the trustee proposed an amended plan of reorganization based on the agreement with the Grand Trunk. CMC objected and retained its own investment banker, First Boston Corporation ("First Boston"), to assist it in opposing the Grand Trunk proposal. While the plan was pending before the court, the Chicago and Northwestern Transportation Company (the "Northwestern") made a competing proposal, which was also opposed by CMC. In February 1984, the Soo Line Railroad Company (the "Soo Line") made an offer which included $40,000,000 in cash. The Northwestern responded with a similar offer including $60,000,000 in cash.

At this point, Shearson requested the trustee to reconsider its method of compensation claiming that, since the 1982 agreement was based on the Railroad's receiving no cash, the bidding war constituted changed circumstances. Shearson made two written proposals to the trustee. In both, Shearson asked for a percentage fee in connection with the sale of the core.

The trustee conceded that, in view of the changed circumstances, it might be appro-

---

**3.** The 1982 agreement specifically provided that Shearson was engaged on "an exclusive basis" to:

a) Review the Estate's existing businesses and assets, including the Milwaukee Land Company, in order to analyze their potential profit contribution to a plan of reorganization.

b) Review and analyze the core railroad system's (the "Railroad") capital structure, operating results, and projections for future operations including the proforma financial statements reflecting the Grand Trunk Corporation's ("GTC") offer to purchase the Railroad.

c) Assist in the development, implementation and confirmation of a plan of reorganization including preparation and presentation

of such expert testimony as the Trustee may require, from time to time, to satisfy the requirements of section 77 of the Bankruptcy Act.

d) Assist in any further negotiations for the sale of the Railroad or portions thereof pursuant to the GTC offer or otherwise.

e) Provide general financial advice as required by the Trustee on all other matters affecting the Estate's financial condition.

f) Provide broker services in connection with the Estate's business and the development, implementation and confirmation of a plan of reorganization except that broker services and fees, if any, in connection with any sale of Milwaukee Land Company timberlands is outside the scope of this Agreement. Appendix of Appellant at 89–90.

priate to revise the 1982 agreement. However, he refused to present to the court a proposed revision of the compensation arrangement in the midst of the bidding process. The trustee promised to review Shearson's compensation at a later date.

Shearson continued to render services in connection with the ongoing bidding and with the ultimate sale. An offer by the Soo Line to assume $395,000,000 in liabilities and to pay $192,000,000 in cash was approved in February 1985.

Pursuant to the Trustee's Modified 1985 Plan of Reorganization,[4] Shearson filed a fee application in the district court. Shearson sought a "transaction fee" of five to six million dollars plus an unspecified "success fee." The district court referred all fee applications to Milton H. Gray, as special master. CMC filed objections to all the fee applications, including Shearson's.

The trustee filed an affidavit in support of Shearson's fee application. The affidavit described Shearson's participation in the sale negotiations and supported an award to Shearson of compensation in excess of that allowed by the 1982 agreement.[5] The special master heard testimony with respect to Shearson's application for six days. During the hearings, CMC objected to the fee application, arguing that Shearson already had been adequately compensated for its services. CMC argued alternatively that any additional compensation should be limited to either the $1,000,000 provided for in the 1982 agreement or $1,750,000, the amount proposed by Shearson to the trustee in February 1984.

At the close of the evidence, CMC asked the special master to recommend summary denial of Shearson's application. The basis for CMC's motion was that Shearson had

4. Section 9.1 of the Trustee's Modified 1985 Plan of Reorganization, approved by the district court on July 12, 1985, provided with respect to fee applications that

[a]fter Confirmation the Court will consider applications for allowance of fees and expenses to the Trustee, his staff and counsel, and other parties claiming fees and expenses pursuant to Paragraphs (c)(2) and (c)(12) of Section 77 of the Bankruptcy Act, other than fees and expenses previously approved by the Court, whether or not paid. These applications are required to be filed on or before August 5, 1985 and will be referred to the Special Master previously appointed in these proceedings for hearing beginning on September 4, 1985. The Special Master will report his recommendations to the court on or before September 30, 1985 and the court will issue a final order or orders awarding fees and expenses on or before October 31, 1985. Record No. A3.

5. The trustee, in his affidavit, made the following comments about Shearson:

Shearson Lehman played an important role in the reorganization proceedings by providing financial counsel to me as Trustee and thus to the debtor, including participating in the formation of financial and economic strategies, the negotiations which ensured the formulation of specific strategies; the consummation of the transactions which followed the negotiations and which allowed the debtor to satisfy all of its creditors and to generate enormous benefits for its shareholders and reorganization plans which were ultimately submitted to the Reorganization Court and the ICC. Simply stated, the work of Shearson Lehman, in conjunction with others, helped save the debtor from economic disaster. The transactions detailed in the Shearson Lehman materials are in addition to Shearson Lehman's daily duties and responsibilities to the Trustee with respect to conducting the normal operations of the debtor.

. . . .

I have reviewed the nature and approximate amount of compensation which Shearson Lehman now seeks. While I am not an expert on fees charged in the investment banking industry, it appears that the fee now sought by Shearson Lehman is consistent with the fee which it received for the Timberland sale transaction—namely 1.1% of the total sale price. If that percentage were followed in the Soo Line transaction, Shearson Lehman would receive a fee of approximately $6 million. It is my understanding that CMC has a fee agreement with First Boston Corporation, an investment banking firm retained by it for services in connection with the sale of the core railroad to the Soo Line, for in excess of $4 million. While Shearson Lehman played a substantial role in negotiations with the Soo Line and the Chicago and North Western Transportation Company, I am unaware of any comparable activities by First Boston.

In conclusion, it is my opinion that the fees to be paid Shearson Lehman should not be limited by the 1982 contract approved by the Court in connection with the pending GTC proposal; rather Shearson Lehman's fee should be determined on the basis of their [sic] contribution to the actual outcome of this reorganization.
Appendix of Appellant at 85–88.

failed to inform the court of its 1984 proposal to the trustee and instead had requested compensation much greater than that contemplated by that earlier proposal. CMC claimed also that Shearson had attempted to avoid discovery of the written 1984 proposals.

In his report and recommendations, the special master concluded that the 1982 agreement did not preclude Shearson from seeking additional compensation. The master then recommended that it would be reasonable to award Shearson $2,047,500 in additional compensation. In addition, the special master recommended against the summary dismissal of Shearson's application on the basis of misconduct, concluding that there was insufficient evidence to support a finding that Shearson had intentionally misled the court.

The district court refused to accept the special master's findings or to adopt his recommendations. Instead, the court held that Shearson was bound by its 1982 agreement with the trustee. Under that agreement, Shearson had failed to negotiate with the trustee for any additional compensation (up to $1,000,000) and to demonstrate to the court that the retainer did not constitute fair and adequate compensation for its services. Shearson therefore was not entitled to any additional compensation. In addition, based on its own finding that Shearson had deliberately concealed documents, the district court ruled that summary dismissal of Shearson's application was appropriate.

## II.

Shearson argues on appeal that the district court erred as a matter of law in holding that Shearson was bound by the 1982 agreement. Shearson further urges us to adopt the special master's finding that $2,047,500 is a reasonable fee and is fully supported by the evidence. CMC and the Railroad respond that the district court correctly held as a matter of law that the 1982 agreement controlled Shearson's right to additional compensation and that under the contract no additional compensation was due.

■ At the outset, we note that the district court's standard of review of the special master's findings and recommendations is the same as our standard of review of the district court. Thus, the district court was required to accept the special master's findings of fact unless they were clearly erroneous. *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680, 689, 66 S.Ct. 1187, 1193, 90 L.Ed. 1515 (1946); *Locklin v. Day–Glo Color Corp.*, 429 F.2d 873, 876 (7th Cir.1970), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 584, 27 L.Ed.2d 632 (1971); Fed.R. Civ.P. 53(e)(2) ("In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous."); J. Moore & J. Lucas, 5A *Moore's Federal Practice* ¶ 52.03[4], at 52– 88 ("a district court's scope of review of the factual fndings [sic] made by a master is comparable to that which the appellate court has over the district court's findings of fact"). The special master's legal conclusions, however, are not entitled to deference by the district court. *Oil, Chem. & Atomic Workers Int'l Union v. National Labor Relations Board*, 547 F.2d 575, 580 (D.C.Cir.1976), *cert. denied*, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977); J. Moore & J. Lucas, *supra*, at 52–88 to –89.

### A.

We examine first the district court's conclusion that Shearson should be bound as to additional compensation by its 1982 agreement. The parties disagree vehemently about the preclusive effect of the 1982 agreement on Shearson's application for additional fees. But neither party offers any authority that effectively supports its position.

In support of its argument that as a matter of law additional compensation is not limited by the contract, Shearson reasons that the court has the power "to review interim fee determinations and make such additional awards as may be justified by the totality of the applicant's services and contribution to the success of the reorganization." Brief of Appellant at 24. For this proposition, Shearson cites *In re Chicago, Rock Island and Pacific Railroad*

*Co.,* No. 75 B 2697 (N.D.Ill. Sept. 4, 1984). In the *Rock Island* case the district court awarded supplemental fees for legal and other services based upon quality of performance and benefit to the estate. There was no mention, however, of a contract that had specifically addressed the right to additional compensation of any party, such as the 1982 agreement here. CMC and the Railroad contend that the special master was wrong as a matter of law in ignoring the contract and reason that "because it was the Court that approved the 1982 contract, only the Court, not the Special Master, could decide to abrogate or supersede it." Brief for Appellees at 20.

 The district court, of course, in a railroad reorganization sits as a court of equity. *Cf. In re Chicago, Milwaukee, St. P. & Pac. R.R.,* 830 F.2d 758, 761 (7th Cir.1987). Such a court exercises broad discretion—particularly in matters involving fees. Here, the district court exercised its discretion in ruling that Shearson's request for additional compensation should be limited by the 1982 agreement. Accordingly, in the absence of an error of law, and unless it is based upon clearly erroneous factual findings, this determination will be upheld on review. *Cf. id.* (applying an "extremely limited standard of review" to a district court's approval of a reorganization plan).

 Certainly, the mere existence of a contract for fees does not necessarily preclude an award of additional compensation. And the district court did not rule that there was such preclusion. Rather, the court in its discretion denied Shearson's application because Shearson "offered utterly no reason why it should not be bound by the [1982] agreement." *In re Chicago,*

*Milwaukee, St. P. & Pac. R.R.,* No. 77 B 8999, slip op. at 20 (N.D.Ill. Dec. 19, 1986) [hereinafter Memorandum Order]. We understand this to mean that, under the particular circumstances of this case, Shearson has failed to convince the court that it was equitable to set aside the 1982 agreement.

In our view, the district court properly exercised its discretion in holding the parties to their 1982 contract even when the parties had apparently agreed informally at a later time that the 1982 agreement should not be controlling as to additional compensation. The district judge in this reorganization proceeding must, of course, take into account considerations beyond the concerns of the trustee and the interests of his investment banker. The district court based its conclusion on two findings by the special master. First, it noted that "this agreement was negotiated by a sophisticated financial institution and a tough-minded former governor, lawyer Trustee." Memorandum Order at 10. Second, the parties had claimed earlier that the agreement "was intended to be comprehensive as to the Shearson services included within its scope." [6] Report of Special Master pt. IV, at 8; *see* Memorandum Order at 18. The district court also observed that Shearson had "induced" the court to approve the agreement. Memorandum Order at 20.

We add to these considerations the fact that Shearson twice had negotiated its fee arrangement with the trustee. We do not wish to encourage parties assisting in reorganizations to repeatedly seek ever-richer bases of compensation whenever they glimpse a bigger pot of gold at the end of the rainbow (in the form of increases in the debtor's estate).

---

6. In seeking the district court's approval of the 1982 agreement, counsel for the trustee addressed this concern:

The only item which the Trustee and [Shearson] had agreed would be accepted [sic] would be if the remaining property of the Milwaukee Land Company were to be put on the market again, then the Trustee would be free to retain whomever the Trustee desired in connection with selling that one block of property. *But any other services as a finder or as a broker are all comprehended within this*

*letter. It is the intention that the letter be comprehensive.* That is why in 1(d) it said that "it includes services to assist in any future negotiations for the sale of the railroad or any portions thereof pursuant to the Grand Trunk transaction offer or otherwise." *So that is intended to cover the whole range of activities.*
Transcript of Proceedings before the Honorable Thomas R. McMillen at 66 (Nov. 29, 1982) (emphasis added).

In light of all these considerations, we are satisfied that the district court properly exercised its discretion in holding Shearson to the $1,000,000 cap on additional compensation which the 1982 agreement provided.

## B.

■ Having approved the district court's decision not to set aside the 1982 agreement, we must now consider whether Shearson is entitled to additional compensation under the terms of that contract. The 1982 agreement establishes two prerequisites to the award of an additional fee of up to $1,000,000: the trustee and Shearson must negotiate in good faith the amount of additional compensation, and the court must find that the retainer alone did not "fairly and adequately compensate Shearson for its services." *See supra* p. 792. The district court refused to approve any additional compensation subject to these conditions because, in its view, the parties had failed to comply with these terms of the contract. Shearson and the trustee had not negotiated in good faith for an additional fee and neither party had attempted to show, nor had the special master found, that the retainer Shearson had received did not fairly and adequately compensate it for services rendered. We acknowledge that in a technical sense these requirements of the 1982 agreement may not have been satisfied. Nonetheless, we think Shearson should receive the additional compensation of $1,000,000.

We turn first to the requirement that the parties negotiate in good faith. It is undisputed that Shearson and the trustee did not negotiate *expressly within the terms of the 1982 agreement*, but Shearson did attempt to negotiate for additional compensation in 1984 when it became apparent that the purchase of the Railroad would involve the payment of cash in addition to the assumption of liabilities. At that time, the trustee wanted to postpone fee discussions because it thought that they might disrupt the bidding process.[7]

In light of the trustee's fiduciary obligations to the Railroad and its creditors, it may be that the trustee and Shearson should have been required to negotiate for an additional fee under the 1984 contract. The district court might have ordered Shearson and the trustee to negotiate for additional compensation of up to $1,000,000. Unfortunately, because the trustee has now been discharged, we cannot at this late date order the parties to negotiate. We feel confident, however, that given the opportunity to do so the trustee would have agreed that Shearson was entitled to the full $1,000,000. This is clear from his affidavit in support of Shearson's fee application, in which it requested a transaction fee of five to six million dollars. *See supra* note 5. Thus the failure to negotiate is certainly not fatal in this case, where the outcome of such negotiations was a foregone conclusion.

---

7. The trustee, in his affidavit, explained the situation as follows:

> Once the Court authorized negotiations with the Soo Line and the Chicago and North Western Transportation Company concerning their expressed interest in a cash plus purchase of the core railroad, Shearson Lehman again approached me to negotiate a new compensation package in the event a cash plus transaction were consummated. I asked Shearson Lehman to defer any fee discussions until after such a transaction was consummated. I was concerned that presenting new fee negotiations to Court at the same time sale negotiations were continuing might jeopardize or impede finalizing a cash plus transaction. I did request that Shearson Lehman participate actively in the negotiations with the Soo Line and the Chicago and North Western Transportation Company with respect to a cash plus transaction for the sale of the core railroad. Shearson Lehman agreed to defer discussions on a new compensation package until a later date and to actively participate in the negotiations with the Soo Line and the Chicago and North Western Transportation Company for the purchase of the core railroad. I also suggested that Shearson Lehman meet with Chicago Milwaukee Corporation's principal shareholder, Odyssey Partners, to confirm both a subsequent fee negotiation and that Shearson Lehman should participate in the negotiations with the Soo Line and the Chicago and North Western Transportation Company. It is my understanding, based upon a review of correspondence submitted between Shearson Lehman and Odyssey Partners, that they agreed to both matters.

Appendix of Appellant at 86–87.

The district court also refused to award additional compensation because, in its view, Shearson failed to show that it was not already fairly and adequately compensated for its services. In summarily deciding this matter, the district court flatly rejected the special master's recommendation that Shearson deserved a "reasonable" fee of $2,047,500.[8]

We decline to adopt the district court's reasoning here. The special master did not make an explicit finding that Shearson's retainer was not fair and adequate compensation because he had decided that the limitations of the 1982 agreement did not apply. The special master instead undertook the task of determining a "reasonable [fee] for an investment banker in view of the services performed and the results achieved." Report of Special Master pt. IV, at 28. In so doing, the special master made findings of fact that are not clearly erroneous.

First, and most importantly, the 1982 agreement itself contemplated that Shearson would receive additional compensation in the event of a successful reorganization. It is uncontroverted that the reorganization of this railroad was immensely successful. Second, the record indicates that "Shearson ably and diligently performed necessary investment banking services in connection with the sale of the core, and thereby played an important role in the successful conclusion of the sale and reorganization." Id. It is worthy of note that "Shearson, as opposed to First Boston, rendered the bulk of the investment banking services in connection with the sale." Id. at 17. First Boston earned a $5,000,000 transaction fee for its work. Third, circumstances changed after the 1982 agreement, requiring Shearson to render services not originally contemplated by that contract.[9]

Given his findings of fact, had the special master considered himself bound by the 1982 agreement, he clearly would have found that Shearson had not been fairly and adequately compensated for its services, and would have recommended the award of $1,000,000. Thus, although CMC and the Railroad argue that the $100,000 per quarter already paid to Shearson is adequate compensation, we think the record establishes that it is not.

With due respect to the district court, we think it took an over-technical view of the requirements of the 1982 agreement. This led to an unfair result.[10] In our view, the 1982 agreement contemplated additional fees of up to $1,000,000 for Shearson as a reward for its assistance in successfully reorganizing the Railroad. The parties' sincere belief that they were not bound by the agreement excuses their noncompliance

---

**8.** The district court reasoned:

There is no evidence in this record that the agreement that Shearson reached in 1982 following arms length transactions did not provide it with fair and adequate compensation. The Master's finding and conclusion that an additional fee of $2,047,500 would be "reasonable" is not the equivalent of finding that the $3,900,000 which Shearson has already received in these proceedings is not fair and adequate. Shearson agreed to that burden and, following a contested proceeding, it and the Trustee induced Judge McMillen to approve of that burden. Shearson has failed to meet the burden that it assumed and accordingly it is entitled to no additional compensation.

Memorandum Order at 18–19.

**9.** The special master found that, at the time the agreement was signed, only the Grand Trunk was interested in acquiring the core, and it offered no cash. More than a year later, when other bidders offered cash, additional investment banking services were necessary. Report of Special Master pt. IV, at 29.

Of less significance, the special master also found: (1) that "CMC's own expert ... stated that the amount Shearson received under the agreement should be on the 'higher side' of that allowable amount rather than on the 'lower side,' " id. at 28; (2) that typically an investment banker assisting in the sale of a business seeks a transaction fee in addition to its retainer because "the retainer fee is usually not of an amount which fully compensates the investment banker for its services," id. at 18; and (3) that "the underlying basis of the 1982 Agreement, that there was no prospect for a cash sale, became moot," id. at 29.

**10.** We suspect that the district court found dispositive its conclusion that Shearson had deliberately concealed documents. Because we reject the court's conclusion that Shearson was intentionally deceptive, see supra pp. 796–97, we think the denial of any additional compensation was unjustified.

with its technical requirements. To overlook those requirements in this case leads to the more equitable conclusion that Shearson has not been fairly and adequately compensated and should receive $1,000,000 additional compensation.

### III.

■ The district court also relied for its denial of additional compensation on its finding that Shearson concealed documents when it presented its fee application. Shearson argues that this finding by the district judge runs contrary to the special master's findings, which must be accepted unless clearly erroneous. *See* Fed.R.Civ.P. 53(e); *see also Locklin*, 429 F.2d at 876. CMC and the Railroad contend that the district court ruled correctly; that the evidence clearly showed that Shearson was deliberately deceptive when it filed fee application papers asking for a five to six million dollar transaction fee. These papers did not disclose Shearson's written 1984 fee proposals requesting alternative transaction fees of less than two million dollars.

The special master, after examining documents and hearing the testimony of witnesses, concluded:

Based on the presentation of both parties, the Special Master concludes that there is not sufficient evidence to find that Shearson intentionally or deliberately misled the Court such that the sanction of dismissal or denial of compensation is appropriate.

Report of Special Master pt. IV, at 37.

The district court was bound to accept these special master findings unless they were clearly erroneous. *See Carini v. Matera*, 592 F.2d 378, 380 (7th Cir.1979) (citations omitted) ("These questions of knowing or reckless falsehood and intent to deceive are questions of fact, and the bankruptcy court's findings on those issues are conclusive unless clearly erroneous."); *see also In re Liming*, 797 F.2d 895, 897 (10th Cir.1986) (citing *Carini*). Here, the district court did not purport to find the special master's findings clearly erroneous. Instead, the court reached an independent

conclusion that Shearson concealed documents from its own counsel in its effort to deceive the court and the beneficiaries of the Railroad estate.

It is well settled that findings of fact made in a bankruptcy proceeding will not be set aside by a reviewing court unless "clearly erroneous." This is a well-established rule of law rooted on the reasonable thesis that a [trier of fact] is best able to appreciate the nuances of demeanor and evidentiary content that go into determinations of the credibility of witnesses.

*In re Martin*, 698 F.2d 883, 885 (7th Cir. 1983) (citations and footnote omitted); *see also United States v. United States Gypsum Co.*, 333 U.S. 364, 365, 68 S.Ct. 525, 526, 92 L.Ed. 746 (1948). Thus, "[the 'clearly erroneous'] standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently," because, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 574, 105 S.Ct. 1504, 1511, 1511–12, 84 L.Ed. 2d 518 (1985).

■ In the present case, the special master reviewed documents (including those allegedly concealed) and presided over a hearing in which a representative of Shearson testified that he could not recall whether written fee proposals existed, and, in any event, that such proposals were not in his file. The special master's determination of the credibility of this witness is entitled to particularly great deference. *See id.* at 575, 105 S.Ct. at 1512. Although we look with some suspicion upon Shearson's failure to provide at the outset the written 1984 fee proposals—especially given the references in its application to the fee discussions that transpired during that same period of time—we certainly cannot say that the special master's finding that Shearson did not *deliberately* intend to deceive was clearly erroneous.

The district court apparently dodged the clearly erroneous standard by analyzing

the syntax of the special master's written findings:

> The first sentence ... is the most perplexing. As we read it, the Master concludes, as a matter of law, that the evidence of Shearson's misbehavior is not "such that the sanction of dismissal or denial of compensation is appropriate." The Master did not, as a matter of fact exonerate Shearson. And the record does not warrant exoneration.

Memorandum Order at 24. The district court seems to have interpreted the special master's report as finding that Shearson's intentional concealment did not warrant the harsh result of dismissal of its fee application. We disagree with the court's interpretation. The special master stated, "[T]here is not sufficient evidence to find that Shearson intentionally or deliberately misled the court...." The remainder of the sentence ("such that the sanction of dismissal or denial of compensation is appropriate") does not negate his evaluation of the evidence with respect to Shearson's intent, an issue of fact. Thus we must disapprove the district court's finding that Shearson intentionally breached a duty of disclosure. Hence, the summary dismissal of its claim for compensation is unjustified.

### IV.

For these reasons, the judgment of the district court is affirmed in part and vacated in part and remanded to the district court with instructions to enter judgment for additional compensation for Shearson in the amount of $1,000,000. The parties will bear their own costs.

AFFIRMED IN PART, VACATED IN PART AND REMANDED.