Willie **WILLIAMS**, on behalf of himself and all others similarly situated, Plaintiffs–Appellees,

v.

Michael P. **LANE**, Director of the Illinois Department of Corrections, et al., Defendants–Appellants.

Nos. 86–2922, 87–2436.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 9, 1987.

Decided June 27, 1988.

Rehearing and Rehearing En Banc Denied Aug. 29, 1988.

Ann Plunkett–Sheldon, Illinois Atty. Gen. Office, Chicago, Ill., for defendants-appellants.

Jack A. Rovner, Kirkland & Ellis, Chicago, Ill., for plaintiffs-appellees.

Before CUMMINGS and FLAUM, Circuit Judges, and GRANT, Senior District Judge.[*]

CUMMINGS, Circuit Judge.

■■■ While lawful imprisonment does deprive convicted prisoners of many rights, *Hudson v. Palmer,* 468 U.S. 517, 524, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393, inmates still retain limited constitutional protection including the First Amendment right to free exercise of religion, *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263, the right of access to courts, *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72, the right to due process restricted only by the nature of the penal system, *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, and the right to equal protection under the laws. *Lee v. Washington,* 390 U.S. 333, 333–334, 88 S.Ct. 994, 994–995, 19 L.Ed.2d 1212. Federal courts, while most reluctant to interfere with the internal administration of state prisons, see, *e.g., Block v. Rutherford,* 468 U.S. 576, 584–585, 104 S.Ct. 3227, 3231–3232, 82 L.Ed.2d 438, nevertheless will intervene to remedy unjustified violations of those rights retained by prisoners, especially when faced with inadequate compliance by prison officials with prior court orders.

Recent decisions of the Supreme Court indicate a reevaluation of the role of federal courts in state prisoner cases. In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447, the Court described the change from a "hands-off" approach to a period when federal courts "waded into this complex arena" to a withdrawal of the federal courts from the "minutiae of prison operations":

There was a time not too long ago when the federal judiciary took a completely "hands-off" approach to the problem of prison administration. In recent years, however, these courts largely have discarded this "hands-off" attitude and have waded into this complex arena. The deplorable conditions and draconian restrictions of some of our Nation's prisons are too well known to require recounting here, and the federal courts rightly have condemned these sordid aspects of our prison systems. But many of these same courts have, in the name of the Constitution, become increasingly enmeshed in the minutiae of prison operations. Judges, after all, are human. They, no less than others in our society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination. But under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan. This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution, or in the case of a federal prison, a statute. The wide range of "judgment calls" that meet constitutional and statutory requirements are confined to officials outside of the Judicial Branch of Government.

*Bell,* 441 U.S. at 562, 99 S.Ct. at 1886; see also *O'Lone v. Estate of Shabazz,* — U.S. ——, 107 S.Ct. 2400, 96 L.Ed.2d 282; *Turner v. Safley,* — U.S. ——, 107 S.Ct. 2254, 96 L.Ed.2d 64; *Walsh v. Mellas,* 837 F.2d 789 (7th Cir.1988), certiorari denied, — U.S. ——, 108 S.Ct. 2832, 100 L.Ed.2d 933. It is in this context that we review the relief granted by the district court to those inmates assigned to protective custody status[1] at the Stateville

---

[*] The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

1. Protective custody is a status available to a Stateville inmate when he fears for his safety or when the warden believes the inmate's safety may be in jeopardy. At any one time, from 200 to 300 of the inmates at Stateville are in protective custody.

Correctional Center in Illinois.[2]

## Factual Background

 Due to the comprehensive nature of the district court's decree, the extensive record in this case must be examined in detail. See *Williams v. Lane*, 646 F.Supp. 1379 (N.D.Ill.1986). In reviewing the case on appeal, we recognize the deference owed to the trial court's findings of fact. Federal Rule of Civil Procedure 52(a) provides that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." In *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518, the Supreme Court stated that " '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Id.* at 573, 105 S.Ct. at 1511 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746); *In re: Chicago, Milwaukee, St. Paul and Pacific R.R. Co.*, 840 F.2d 1308 (7th Cir.1988). A reviewing court may not reject a factual finding simply because it disagrees with the trier of fact. *Id.* Further, a reviewing court must show even greater deference to the trial court's findings that involve credibility of witnesses, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575, 105 S.Ct. at 1512; see also *Bullard v. Sercon Corp.*, 846 F.2d 463, 466 (7th Cir.1988).

This Court recently applied the rule to a prisoners' civil rights claim in *Hadi v. Horn*, 830 F.2d 779 (7th Cir.1987), where in the context of the prison officials' position on the interests of security, we held that "the district court's finding on this point is one of fact which we must accept unless it is clearly erroneous." *Id.* at 784.

The defendants in this case waited until their reply brief before articulating their view of the proper scope of review regarding the district court's factual findings. In their reply brief, defendants offer in a conclusory fashion various examples of what they consider clearly erroneous findings of facts on the security concerns of the prison officials. These unpersuasive arguments are really a thinly-guised attack on the credibility determinations of Judge Shadur, which "can virtually never be clear error." *Anderson*, 470 U.S. at 575, 105 S.Ct. at 1513. Based on both the demeanor of the witnesses and the substantial record evidence, the district court held that the defendants' security explanations were "not credible as a factual matter." Defendants now rely almost completely on the discredited testimony of defendants DeRobertis and O'Leary while also insisting that the court failed to allow them the deference they deserve as prison administrators.

 As an initial matter, we reject these excuses. The district court quite properly refused to accept defendants' testimony because it conflicted with the objective factual record. The inconsistencies and contradictions in their statements were adjudged "frankly unworthy of belief." Moreover, a court's "deference to the administrative expertise and discretionary authority of correctional officials must be schooled, not absolute." *Campbell v. Miller*, 787 F.2d 217, 227 n. 17 (7th Cir.1986), certiorari denied, 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed. 2d 724. In this case, in contrast to *O'Lone* and *Turner*, the defendants failed to establish a record which revealed the manner in which security considerations were seriously implicated by the unequal treatment afforded to protective custody status inmates. See *Caldwell v. Miller*, 790 F.2d 589, 597 (7th Cir.1986). Defendants have confused deference with credibility in their

---

**2.** Stateville is a maximum security prison run by the defendants which houses approximately 2,000 inmates within five cellhouses. Inmates serve time for violent crimes such as murder and Class X felonies. Stateville has been the subject of recent litigation before this Court.

See, *e.g., Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir.1988); *Williams v. Boles*, 841 F.2d 181 (7th Cir.1988); *Walsh v. Mellas*, 837 F.2d 789 (7th Cir.1988), certiorari denied, —— U.S. ——, 108 S.Ct. 2832, 100 L.Ed.2d 933.

arguments here. The record of the proceedings below shows that the district court did not second-guess the administrator's determination. Rather, the court weighed the evidence and carefully considered what was argued before it by defendants.

Having discussed the relevant standard of review, it is now appropriate to turn to the history of plaintiffs' action. This case concerns a prisoner's civil rights class action suit for both injunctive relief and damages under 42 U.S.C. § 1983 and Illinois state law. The plaintiffs are inmates at Stateville Correctional Center near Joliet, Illinois, and the class representative is Willie Williams, who was incarcerated in the prison's protective custody unit from November 1977 to October 1983. The plaintiff class consists of all inmates assigned to protective custody at Stateville since April 30, 1982. The plaintiffs allege that their rights have been violated due in part to the living conditions and institutional programs assigned to them by the defendants.

The defendants are state prison officials sued in their individual capacities for acts taken under color of state law. Principal defendants include Michael Lane, director of the Illinois Department of Corrections (Department) since 1981; Richard DeRobertis, Stateville warden between July 1980 and November 1983; Michael O'Leary, Stateville warden after DeRobertis; Salvadore Goding, the assistant warden under both DeRobertis and O'Leary; Gayle Franzen, Department director from January 1979 to February 1981; Marvin Reed, warden from June 1979 to June 1980; and Lou Brewer, warden from September 1978 to June 1979.

The plaintiffs basically claimed that the defendants violated these protective custody prisoners' constitutional rights by failing to provide them with access to the same programs and services offered the general population inmates at Stateville. Specifically, this included denial of (1) their free exercise of religion, (2) meaningful access to the courts, (3) freedom from cruel and unusual punishment, and (4) their rights to due process and equal protection by failing to provide comparable programming and living conditions. Plaintiffs also alleged that defendants violated state law by not following the requirements of Administrative Regulation 808 ("A.R. 808"), adopted by the Department in 1976, which, besides creating a protective custody unit in each maximum security prison, mandates that "[h]ousing and programmatic accommodations shall be comparable to those provided for the general population." A.R. 808 was revised in 1982 to allow for the implementation of the consent decree entered in *Meeks v. Lane*, 75 C 96 (three-judge district court, N.D.Ill.1981), and reproduced in the plaintiffs' Appendix. This decree required, *inter alia*, that defendants provide inmates in protective custody "with the same opportunities as other inmates in other housing areas of the general population for … job assignments, vocational and educational assignments, recreation, access to prison libraries, access to religious services and to all other institutional programs."[3]

To understand the nature of this case, it is first necessary to describe the protective custody status available in Stateville through the programs and living conditions

---

**3.** The *Meeks* decree further required that the defendants provide all inmates in the protective custody area: (1) "the opportunity to attend a communal religious service outside their cells once per week"; (2) "access to the general library at least one hour per week, and to the prison law library for at least four hours per week"; (3) "law clerks … to do research and obtain copies" and "library clerks who will circulate within the unit on a daily basis"; (4) "educational opportunities commensurate with those available to inmates in the general population," including "college credit courses"; (5) "job opportunities"; (6) at least "seven hours per

week of out-of-cell recreation" (and a good faith effort to provide more); and (7) "food of comparable quality, quantity, and temperature as that provided to inmates assigned to general population" (and a good faith effort "to locate an area [in Stateville] suitable for use as a protective custody dining area").

Revised A.R. 808 stated that "[h]ousing arrangements and essential services shall be comparable to those provided for the general population." The district court found that "comparable" as used in A.R. 808 means "equivalent" or "equal in value or extent" (646 F.Supp. at 1335).

which consist of religious counseling, library services, educational and occupational instruction, recreational opportunities, and food service. As seen, assignment to protective custody status (see n. 1 *supra*) was initially provided for by A.R. 808. This status is not made for disciplinary reasons; rather inmates are placed in protective custody for their own safety. It is truly neither "voluntary" nor "temporary": the Department has to substantiate the identifiable threat and approve the placement, and for their own protection inmates may spend much of their sentence in protective custody.

Until January 1979, all protective custody inmates in Stateville were assigned to Cellhouse E. After the Department locked down Stateville in early 1979,[4] all residents with this status were moved to Cellhouse B–West and housed with the disciplinary segregation inmates who had been found guilty of violating prison rules. Both categories of inmates remained there until April 1982, when the Department separated them by moving the disciplinary segregation inmates to Cellhouse F. In January 1985, the Department moved all protective custody inmates to Cellhouse H, which had previously housed inmates of the general population.

Since May 1979, when the protective custody inmates were moved to be housed with the disciplinary segregation inmates, the programs and living conditions of plaintiffs have been substantially restricted. It is necessary to compare the services available to the general population inmates to understand this disparity of service allocation.

The Department provides Stateville's general population inmates the opportunity for free exercise of religion through communal worship services, classroom religious instructions, and private religious counseling. Chaplains meet regularly with all such inmates who request private meetings. Protective custody inmates, however, have received significantly inferior access to religious services since the move in May 1979. There are neither communal worship services nor classroom religious instructions. The only permitted religious programming was to allow the prison chaplains to counsel inmates through the cell bar doors.

After implementation of the 1981 *Meeks* consent decree, in January 1983 the Department agreed to provide protective custody inmates with one non-denominational communal worship service at the rear of Cellhouse B–West. These services, however, were eliminated in mid–1984 without explanation. After protective custody residents were moved to Cellhouse H in early 1985, this service was reinstated and held in the small area converted from garage use, permitting only 25 inmates to attend. The Department still does not allow these inmates to meet privately with clergy; the clerical staff is forced to counsel through the cell doors' "chuck hole." Visits by these clergymen average once a week.

A second area of programming, library services, is made available to the general population without burdensome restrictions. This library access includes legal materials, newspapers, magazines, audiovisual materials, legal counseling and assistance, and special programs on mental health, ethnic and cultural awareness, and paralegal training. As was the situation with religious services, after the lockdown protective custody prisoners received markedly inadequate and inferior access to the library. When an inmate of this status wants to go to the library, he must be locked alone in one of seven special security cages, except that cellmates, co-litigants, or co-defendants can share a cage. These inmates may not leave the cages, and they must depend on a library clerk to retrieve materials for them.

Access to the library also differs from that of the general population in the following respects: requests to go to the library are taken on a first-come, first-serve basis; the law clerks may not obtain general library materials for plaintiffs unless specially approved by a general library clerk; plaintiffs are never allowed to attend any

---

**4.** Lockdown is locking all prisoners in their cells except for very brief periods.

special library programs; and to obtain legal counseling, plaintiffs have to discuss their cases with either the Chief Legal Advocate or law clerk, who must stand outside the bars of the library cage. Finally, with the move of protective custody inmates to Cellhouse H in January 1985, library carts were not permitted to come to the protective custody unit to provide any satellite services.

Various vocational and educational programs also are provided to general population inmates aimed at providing rehabilitation. These services are designed to encourage the attainment of higher education and to maintain professional instruction. Between May 1979 and November 1982, however, no vocational jobs were available for protective custody inmates. Only after entry of the *Meeks* decree have a limited number of such jobs been made available. Educational instruction for these inmates has not fared much better. Between May 1979 and January 1983, there were no classroom courses, with only basic education tutoring provided through the doors of the cells. Since implementation of the *Meeks* decree, a single college-level course and a limited General Education Development program were offered. The college course was discontinued in 1985 with the move to Cellhouse H. Demand for general instruction always exceeds the permitted number of registrants.

Finally, basic living conditions between those inmates of general population and protective custody status are simply not comparable. Protective custody inmates must eat all meals in their rooms, and these unpalatable meals were transported in unheated carts until November 1985. Recreational opportunities are poor for protective custody inmates. They are permitted no indoor recreation in gymnasium or social halls. They have solely 1¼ hours of dayroom or yard access on alternate days.

The Department attempted to explain this disparate treatment as "security-motivated" or "security-oriented," explanations found arbitrary, exaggerated, and pretextual by the district court. It was quick to acknowledge that "[a]s a maximum security prison housing inmates drawn from among the worst offenders in Illinois, Stateville presents understandable security concerns." But in attempting to isolate protective custody inmates from the general population, the Department chose to treat these inmates with the same security procedures afforded those involuntarily assigned to disciplinary segregation.

The Department's articulated security concerns are belied by its inconsistent manner in treating protective custody inmates, its unused viable options to the restricted living conditions and lack of programming, its actions totally unrelated to security, and finally its lack of effort to provide comparable programming. We will highlight some of these matters which were extensively noted by the district court.

The Department's conduct demonstrates how its security reliance rationale is incomplete. This is first revealed in the inconsistent behavior afforded to protective custody inmates. While these inmates were permitted to take daily exercise together, they could not go to the library as a group. Inmates could exercise in the dayrooms together; yet they had to eat in their cells separately. Finally, the Department allowed groups to walk in the yard communally while prohibiting such recreation as watching movies together.

The district court, after of course realizing that it was not its function to assume responsibility for managing Stateville, named several available alternatives providing comparable conditions and programming to plaintiffs without jeopardizing any properly applied security concerns of the Department: (1) Stateville has many areas of usable space that could be converted to activity space; (2) light vocational training could be offered to inmates to be performed in their own cells; (3) a protective custody dining room could be added in Cellhouse H which would satisfy *Meeks;* (4) revised library scheduling could allow greater access to inmates; and (5) night-shift work details could be implemented to allow protective custody inmates the opportunity to earn money.

These available alternatives were not pursued by the Department for reasons unrelated to security. Satellite law libraries, denominational worship services, vocational training in individual cells, and more Sunday recreation for protective custody inmates were all options found by the court to be without any significantly increased security burdens.

In summarizing, Judge Shadur found that this disparity in programs stemmed from the Department's lack of desire to make improvements, when opportunities to make such changes were long available to the defendants. Evidence adduced at the bench trial tended to show that the Department did have the ability to overcome security and operational concerns when it chose to do so.

After weighing this evidence, the court found for plaintiffs, denied defendants qualified immunity from damages, held that compensatory damages would be proper, and reserved ruling on punitive damages. 646 F.Supp. at 1409–1410. The court did not enter a remedial order with its opinion. Rather, in deference to the Department, it first directed the defendants to submit their views on the scope of a proper remedial plan. Finding their subsequent submissions inadequate, the court again requested defendants to specify what remedy would be consistent with the security needs of Stateville.

The defendants provided plaintiffs' counsel with their tentative proposals on May 22, 1987, and on July 7, the court ordered defendants to show cause why they should not be held in contempt because their proposal "could not, under any view, have been understood by them in good faith as conforming to what this court had ordered them to do" (Sup.App. 27).

Defendants responded on July 21, 1987, but the district court again found defendants' conduct intransigent and ordered them to provide a schedule of program changes by August 4, 1987 to comply with the earlier opinion. When this submission

again stated that compliance was not feasible, the court adopted the suggestion by the plaintiffs to appoint a special master to assist the court in developing timetables to have the Department adhere to the mandate issued in the opinion (Sup.App. 54–56).

The defendants objected to this proposed appointment. On August 31, 1987, the court entered its final injunctive order which permanently enjoined the Department from violating the inmates' constitutional rights, ordered the Department to provide plaintiffs with comparable programs and living conditions as to those afforded the general population, and provided for the appointment of a special master to develop, evaluate, and scrutinize the defendants' implementation of remedial relief to be entered at a later date.[5] On September 23, 1987, this Court granted defendants' motion to stay the final order pending appeal. We extended this stay on December 17, 1987, so that the situation could be properly evaluated here.

### Analysis

■ On appeal, defendants initially contend that the district court ignored "a fundamental principle of law enunciated by the Supreme Court in prisoner's rights cases; that is, the principle of judicial deference to prison administrators in the operation of their institutions." They also point to the recent decisions in *Turner v. Safley*, —— U.S. ——, 107 S.Ct. 2254, 96 L.Ed.2d 64, and *O'Lone v. Estate of Shabazz*, —— U.S. ——, 107 S.Ct. 2400, 96 L.Ed.2d 282, but *Turner* acknowledged that a prison regulation "cannot be sustained when the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary and irrational." 107 S.Ct. at 2261. A prison regulation that infringes on inmates' constitutional rights is valid only "if it is reasonably related to legitimate penological interests." *Id.* at 2261; *O'Lone*, 107 S.Ct. at 2404; see also *Reed v.*

---

**5.** The injunction is not officially reported but is reproduced as the first item in defendants' Appendix.

*Faulkner,* 842 F.2d 960 (7th Cir.1988).[6] This Court, in *Hadi v. Horn,* 830 F.2d 779, 784 (7th Cir.1987), reviewed both *O'Lone* and *Turner,* and grouped the several factors used in applying the "reasonableness" standard into a four-part test:

1. "whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule";

2. "whether there are alternative means of exercising the right in question that remain available to prisoners";

3. "the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources"; and

4. "although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable."

We again rely on these factors to determine whether Stateville's restriction of plaintiffs' constitutional rights to free exercise of religion, meaningful access to the courts through use of library services, due process, and equal protection were reasonable in light of legitimate security concerns. The district court determined that these restrictions were arbitrary and pretextual, bearing no reasonable relationship to legitimate penological interests. This finding must be accepted unless clearly erroneous. *Hadi,* 830 F.2d at 784. After reviewing the various allegations of deprivations, we then analyze defendants' arguments that the court below improperly (1) relied on violations of Illinois law, (2) failed to accord the defendants qualified immunity for their actions or omissions, (3) did not consider the Eleventh Amendment bar to suits against the state, and (4) exceeded its remedial power by improperly authorizing the appointment of a special master.

*Freedom of Religion*

■ Inmates have only those First Amendment rights that are consistent with prison discipline and do not conflict with legitimate objectives of institutional administration. See *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 129–130, 97 S.Ct. 2532, 2539–2540, 53 L.Ed.2d 629; *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495; *Ustrak v. Fairman,* 781 F.2d 573, 580 (7th Cir.1986), certiorari denied, 479 U.S. 824, 107 S.Ct. 95, 93 L.Ed.2d 47. But prison officials may not interfere with a prisoner's free exercise of religion unless the asserted regulation is justified by a legitimate penal interest. In *Wells v. Franzen,* 777 F.2d 1258, 1265 (7th Cir. 1985), this Court found such a legitimate interest when it upheld the denial of a prisoner's opportunity to practice his religion when he was physically restrained due to suicidal tendencies. We also found a legitimate interest supported by considerations of safety and security in the regulation of a Rastafarian's hair length by prison officials in *Reed v. Faulkner,* 842 F.2d 960.

■ Prison administrators must permit inmates the reasonable opportunity to exercise religious freedom. *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263; *Caldwell v. Miller,* 790 F.2d at 596, and the state need not demonstrate that there is no reasonable alternative method by which the prisoner's First Amendment rights can be accommodated without creating security problems. *O'Lone,* 107 S.Ct. at 2405. Courts balance these competing interests to determine if the inmate's First Amendment rights should prevail. *Turner,* 107 S.Ct. at 2264.

■ The district court ruled that defendants violated plaintiffs' right to the free exercise of their religion by not allowing communal religious services, by not permitting prisoners participation in rituals of their faith, and by depriving the inmates of

---

**6.** Judge Shadur was without the benefit of *O'Lone* and *Turner.* He relied upon the standard articulated in *Caldwell v. Miller,* 790 F.2d 589, 597–598 (7th Cir.1986). This Court, however, recognized in *Hadi v. Horn,* 830 F.2d 779, 784 n. 6 (7th Cir.1987), that *"O'Lone* and *Turner* have served to clarify and amplify, rather than depart from, [the *Caldwell* ] standard."

religious counseling and instruction. Viewing the facts of this case in light of the *Caldwell* standard that prison restrictions on religious activities must be reasonably adopted to achieve an important correctional goal and reasonably necessitated by security considerations, the court found that defendants denied these opportunities without a reasonable relationship to legitimate penological interests. This denial thus failed the first part of our recent *Hadi* test, for no "valid, rational connection exists between the regulation and a legitimate government interest behind the rule[s]." *Hadi*, 830 F.2d at 784.

Defendants oppose a conclusion that Stateville's policies in providing religious services to protective custody inmates were inferior. They assert that "the logical relationship between the single non-denominational service and the protective custody inmate is apparent" (Br. 34). This policy is allegedly implemented because offering different religious services would "increase the risks" to inmates due to "increased numbers of group movements."

Focusing on the *O'Lone* analysis, they further claim that there are other means available for protective custody inmates to exercise their religion through daily visits from chaplains and the distribution and receipt of religious materials. According to defendants, any increased number of communal services would have an allegedly burdensome "ripple" effect on both the staffing and programming in protective custody.

These justifications simply do not remedy the inadequate and needlessly inferior alternatives that the inmates have to exercise their religious beliefs. That the district court could offer some easily available and obvious options to provide more sufficiently the right to religion clearly shows that the Department's current policies were unreasonable. Defendants have offered no tenable ground for overruling the conclusion below that the Department's denial of the inmates' opportunities for regular communal worship, religious instruction, and private religious counseling did not bear an adequate relationship to legitimate penological interests.

### Right of Access to Courts

 Under the Fourteenth Amendment prisoners have the due process right to adequate, effective, and meaningful access to courts to challenge violations of their constitutional rights, *Bounds*, 430 U.S. at 824, 97 S.Ct. at 1496, and this access neither may be denied nor obstructed. *Johnson v. Avery*, 393 U.S. 483, 485, 89 S.Ct. 747, 748, 21 L.Ed.2d 718. Prison officials correspondingly have an affirmative duty to assist prisoners in preparing and filing legal papers. This may be accomplished either by establishing a law library or by providing consultation from legally trained assistants. *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498. These officials cannot hinder prisoners from this access, *Wolff v. McDonnell*, 418 U.S. at 578, 94 S.Ct. at 2985, or retaliate against prisoners who attempt to exercise their constitutional rights. See *Adams v. James*, 784 F.2d 1077, 1082 (11th Cir.1986). This Court has articulated the constitutional standard to require "meaningful," not total or unlimited, access to courts. *Martin v. Tyson*, 845 F.2d 1451, 1456 (7th Cir.1988); *Campbell v. Miller*, 787 F.2d 217, 226 (7th Cir. 1986). Restrictions on this access will not be an unconstitutional interference when justified by security concerns, which prison officials bear the burden of proving. *Id.*

 Prison officials need not provide both direct legal aid and access to a law library so long as prisoners receive meaningful access. *Bounds*, 430 U.S. at 832, 97 S.Ct. at 1500. Administrators may devise constitutionally acceptable alternatives if the prison's functioning will become unduly burdened by providing a particular type of access. This Court has recently sustained such restrictions on access to accommodate legitimate administrative concerns. In *Campbell*, restrictions on library access and attorney visitation were justified for security reasons. 787 F.2d at 226–228. The institution's system of requesting case law materials by exact date was upheld when dangerous inmates were de-

nied full access to the prison's main law library. *Id.* at 229. In sustaining the restrictions, we held that "[p]rison administrators may exercise wide discretion within the bounds of the constitutional requirements of meaningful access." *Id.*

In *Caldwell v. Miller*, 790 F.2d 589, 606 (7th Cir.1986), restrictions on library use as part of the post-riot lockdown at the Marion Penitentiary were deemed permissible. This Court upheld as constitutionally adequate a plan that provided for inmate access to a "satellite" library coupled with a system for requesting materials from the main branch.

Similarly, in *Gaines v. Lane*, 790 F.2d 1299, 1308 (7th Cir.1986), prison authorities were allowed to balance the right of the prisoners to use the mails for court access with considerations of the institution's budget. Prisoners there were permitted to mail at state expense three first-class letters per week plus reasonable additional legal correspondence. *Id.*

▮ Finding that the library services provided to plaintiffs had been inadequate, the district court in this case concluded that plaintiffs had been deprived of meaningful access to the courts. The court analogized this situation to the "Catch–22" present in *Corgain v. Miller*, 708 F.2d 1241, 1250 (7th Cir.1983), where inmates at the Marion federal penitentiary were denied access to the courts due to the library's lack of either state law materials or sufficient supplemental legal aid. In this case, "[e]ven if an inmate were sophisticated and attuned to the nuances of legal meaning, the limitations imposed by defendants would convert the possible work of minutes into a need to spend hours—and, moreover, hours to which no plaintiff could gain access" (646 F.Supp. at 1389).

Defendants disagree with this finding and contend that the access to the law library provided to protective custody inmates at Stateville meets the constitutional mandate of "meaningful access" to the courts. Viewing the Stateville plan as a whole, they contend that it meets the requirements of the *Bounds* case because the Department allegedly provides the inmates

with trained assistance and regular access to an adequate legal library. Defendants' restriction of the plaintiffs' right to meaningful access, however, again fails to satisfy the *Hadi* standards. The access is severely inadequate in comparison to that afforded the general population. Moreover, the options such as rescheduling of library hours and use of satellite libraries would be viable alternatives to the current quandary faced by protective custody inmates desiring to do legal research. The evidence before the lower court sustains our holding that neither a reasonable relationship to a legitimate penological interest nor any negative impact from accommodating plaintiffs' right to court access was credibly identified. This arbitrary denial of access to published materials certainly violated the protective custody inmates' First Amendment rights. *Martin, supra,* at 1454.

### Due Process Protections

Plaintiffs here asserted that the defendants' restrictions on their religion and access to court rights and denial of housing and programmatic conditions comparable to those offered the general population residents violated their rights to due process and equal protection. The district court considered the due process and equal protection claims together, but we review them separately for purposes of this appeal.

▮ Prisoners claiming a due process violation under the Fourteenth Amendment must demonstrate that they have been deprived of a protected liberty or property interest by arbitrary government action. *Meachum v. Fano*, 427 U.S. 215, 223–224, 96 S.Ct. 2532, 2537–2538, 49 L.Ed.2d 451. These interests may arise from the Constitution, see *Vitek v. Jones*, 445 U.S. 480, 493–494, 100 S.Ct. 1254, 1263–1264, 63 L.Ed.2d 552; cf. *Newburg v. Prisoner Review Board*, 791 F.2d 81, 85 (7th Cir.1986), statutes, see *Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1, 7–11, 99 S.Ct. 2100, 2103–2106, 60 L.Ed.2d 668; *Walker v. Prisoner Review Board*, 769 F.2d 396, 400 (7th Cir.1985),

certiorari denied, 474 U.S. 1065, 106 S.Ct. 817, 88 L.Ed.2d 791; but see *Harris v. Fleming*, 839 F.2d 1232 (7th Cir.1988) (prisoners ordinarily have no liberty or property interests in receiving or retaining a job while in prison); *Toney–El v. Franzen*, 777 F.2d 1224, 1226–1227 (7th Cir.1985) (where state remedies are adequate, inmate has no constitutionally protected liberty interest in early release despite state statute affording good time credits), certiorari denied, 476 U.S. 1178, 106 S.Ct. 2909, 90 L.Ed.2d 994, and administrative regulations, see *Hewitt v. Helms*, 459 U.S. 460, 471–472, 103 S.Ct. 864, 871–872, 74 L.Ed.2d 675; *Fleury v. Clayton*, 847 F.2d 1229, 1230, 1232 (7th Cir.1988); cf. *Mathews v. Fairman*, 779 F.2d 409, 414–415 (7th Cir.1985) (regulation on administrative transfers did not limit official discretion and did not create protected liberty interest). See generally *Caldwell v. Miller*, 790 F.2d at 602.

■■■■ Once an alleged liberty interest is considered protected, the court then determines what process is due the prisoner by balancing the private interest affected, the risk of error in the procedures used, and the state interest in institutional security. See *Wolff v. McDonnell*, 418 U.S. at 556, 94 S.Ct. at 2974. The particular due process protections are limited by the need to pursue legitimate correctional goals. *Id.* Any additional procedural safeguards depend on the balance between the rights accorded both private and governmental interests. See, *e.g., Mendoza v. Miller*, 779 F.2d 1287, 1294–1296 (7th Cir.1985) (officials need not reveal factual bases for disciplinary decisions involving informants); *Garza v. Henderson*, 779 F.2d 390, 394–397 (7th Cir.1985) (prison disciplinary hearing held without inmate present does not violate due process unless prejudice demonstrated); *Merritt v. De Los Santos*, 721 F.2d 598, 600–601 (7th Cir.1983) (due process violated when member of disciplinary tribunal involved in alleged incident); *Dawson v. Smith*, 719 F.2d 896, 898–899 (7th Cir.1983) (prison disciplinary committee need not disclose source of confidential re-

port), certiorari denied, 466 U.S. 929, 104 S.Ct. 1714, 80 L.Ed.2d 186.

■■■ Defendants here claim that the protective custody inmates' due process rights have not been violated because first, the Fourteenth Amendment creates no liberty interest in remaining in the general inmate population as opposed to protective custody, and second, Illinois law, as embodied in A.R. 808 (now Department Rule 501.‑310), creates no liberty interest under the facts alleged by plaintiffs. The first claim is irrelevant, for defendants never dispute that the plaintiffs have a constitutional interest in receiving meaningful opportunities for free exercise of religion and access to the courts. As shown, they have been deprived of those rights. Defendants cite *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675, for the proposition that the transfer of an inmate to less amenable quarters for non-punitive reasons does not violate the Constitution. But in light of the district court's finding that there were no meaningful opportunities to exercise the plaintiffs' religious and court access rights, this argument does not respond to the truism that a liberty interest in those rights is protected.

The same is true of plaintiffs' claim of due process with respect to housing and programs under a state-created liberty interest. A.R. 808 had binding force because it was adopted according to proper administrative procedures and required that "[h]ousing and programmatic accommodations [for protective custody inmates] shall be comparable to those provided for the general population."[7] See *Miller v. Henman*, 804 F.2d 421, 426 (7th Cir.1986). Substantive limitations were placed on the Department's discretion, *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813, and the mandatory language ("shall") of the 808 regulation created an expectation of and an entitlement to housing and services comparable to the general population's for protective

7. In the revised version of A.R. 808 responding to the broad 1981 *Meeks* decree, "essential services" was substituted for "programmatic ac-

commodations" to mesh with that decree (646 F.Supp. at 1385).

custody inmates. See *Board of Pardons v. Allen,* — U.S. —, 107 S.Ct. 2415, 2420–2421, 96 L.Ed.2d 303. Furthermore, "specific substantive predicates," *Harris v. McDonald,* 737 F.2d 662, 665 (7th Cir.1984), were contained in A.R. 808 to create such a liberty interest.

Defendants merely assert that *Hewitt* governs, and that only regulations governing involuntary placement of inmates create a liberty interest. 103 S.Ct. at 871; see also *Fleury, supra,* at 1232. Yet as found by the district court, protective custody is "not truly voluntary." The Department's further attempt to show that "comparable" implies only official discretion to choose services rather than not afford protective custody inmates equal treatment does not mesh with the *Meeks* decree, which specifically described the programs and services required for these inmates. It is unquestioned that the revised A.R. 808 was intended to incorporate the *Meeks* requirements.

The record below properly supports the district court's conclusion that the Department's decision to deprive plaintiffs of the foregoing rights was arbitrary. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 539–541, 105 S.Ct. 1487, 1491–1493, 84 L.Ed.2d 494. "Due process rights are not infringed when the imposition in question is reasonably related to a legitimate governmental purpose." *Martin, supra,* at 1458. But when weighed against the factors in *Hadi, supra,* defendants' deprivations of plaintiffs' right to religion, and access to courts and *Meeks* housing programs and services were unreasonable, therefore denying the inmates their liberty interests without due process of law.

### Equal Protection

 Prisoners do not surrender their rights to equal protection at the prison gate. Unequal treatment among inmates, however, is justified if it bears a rational relation to legitimate penal interest. *Hudson v. Palmer,* 468 U.S. 517, 522–523, 104 S.Ct. 3194, 3197–3199, 82 L.Ed.2d 393. Compare *Harris v. Greer,* 750 F.2d 617, 618–619 (7th Cir.1984) (alleged racial segregation by cell and job assignment states claim) and *Madyun v. Thompson,* 657 F.2d 868, 873–874 (7th Cir.1981) (allegation of racially motivated misuse of authority states claim) with *Kincaid v. Duckworth,* 689 F.2d 702, 704 (7th Cir.1982) (four-year difference between life termers and inmates under term of years for eligibility for change of security status justified by security risk). Plaintiffs claimed that the defendants' provisions for programming and living conditions were unequal in comparison with general population inmates. This intentional disregard of plaintiffs' rights in adopting certain policies was tantamount to intentional discriminatory behavior. See *David K. v. Lane,* 839 F.2d 1265 (7th Cir.1988). The district court agreed with plaintiffs and held that defendants' regulations did "not bear any such rational relationship to any legitimate state purpose—instead, their purported justification in terms of security concerns is an arbitrary and exaggerated response and masks defendants' real delinquencies."

To escape liability for disparately treating plaintiffs, defendants rely on this Circuit's decision in *French v. Owens,* 777 F.2d 1250 (7th Cir.1985), certiorari denied, 479 U.S. 817, 107 S.Ct. 77, 93 L.Ed.2d 32, where the unequal treatment of protective custody inmates had "a substantial rational basis in the legitimate interest of prison security." *Id.* at 1256 (quoting *Allgood v. Morris,* 724 F.2d 1098, 1101 (4th Cir.1984)). In *French,* four inmates in protective custody at an Indiana state prison claimed that they did not have equal access to the same vocational, academic, and rehabilitation programs as the general population. We held that security reasons can justify limiting the access of prisoners in protective custody. *Id.* at 1256; see also *Taylor v. Rogers,* 781 F.2d 1047, 1050 (4th Cir.1986) (same).

These cases, however, are inapposite—distinguishable because here the Department's explanations for security concerns were discredited by the court below. These defendants failed to establish the necessary relationship between prison security and disparate treatment of residents of protective custody, a relationship deemed crucial by this Court in *French.*

To the extent the district court's legal conclusions concerning disparate treatment depend on its evidentiary findings that defendants' policies were illegitimate, deference must be accorded to the district court's ruling. See *David K.*, 839 F.2d at 1265. We therefore approve the district court's decision that the Department's policies violated plaintiffs' equal protection rights.

### Illinois State Law

Plaintiffs initially asserted before the district court that defendants' denial of housing and programmatic conditions comparable to those provided general population residents and of comparable opportunity for rehabilitation and parole each violates Illinois state law. Based on that claim, defendants now argue that the final injunctive order rested on violations of state law and that the district court ordered their compliance with A.R. 808. A violation of state law would not create liability under Section 1983. See *Fleury, supra,* at 1230; *Martin, supra,* at 1455; cf. *Jones v. Thieret,* 846 F.2d 457, 460 (7th Cir.1988).

While the court did find that the defendants' failure to comply with A.R. 808 and the *Meeks* decree violated state law, the court did not premise its order of injunctive relief on those alleged violations. Rather, the court specifically announced that it had removed "the references to 'under the laws of the State of Illinois' ... because I am not ordering compliance with state law as such." (Pl.Br. at 45). The court properly justified its order on the foregoing federal constitutional deprivations.

### Defenses to Liability
### Qualified Immunity

The defense of immunity may prevent an inmate from securing relief for deprivations of constitutional rights. Prison officials who act in good faith receive qualified immunity for their actions. *Procunier v. Navarette,* 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24. The objective test established by the Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 818,

102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, and recently reiterated in *Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, shields officials from liability if they did not violate clearly established constitutional or statutory rights of which a reasonable person would have known. See also *Rakovich v. Wade,* 850 F.2d 1180, 1208–1214, (7th Cir.1988) (*en banc*); *Kurowski v. Krajewski,* 848 F.2d 767, 773 (7th Cir.1988); *Forrester v. White,* 846 F.2d 29, 32 n. 1 (7th Cir.1988); *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986). In *Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139, the Court further held that claimants must show that the rights allegedly violated were clearly established at the time of the conduct at issue. See also *Wade v. Hegner,* 804 F.2d 67, 71 (7th Cir.1986). Defendants have the burden of proof of satisfying this affirmative defense. See *Klein v. Ryan,* 847 F.2d 368, 369 (7th Cir.1988); *Walsh,* 837 F.2d at 789.

Because this Court is reviewing a denial of a claim of qualified immunity, it is necessary to decide "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed. 2d 411. Moreover, "[t]o determine whether such legal norms existed at the pertinent time, we often refer to closely analogous case law, decided before the public official acted or failed to act." *Abel v. Miller,* 824 F.2d 1522, 1533 (7th Cir.1987).

Defendants, conceding that the district court relied on landmark Supreme Court cases which either established or reaffirmed general constitutional rights, make the shallow argument that the cases relied on did not clearly establish the specific rights to meaningful access to the courts, free exercise of religion, due process, and equal protection. Yet each of the cases used as support by plaintiffs clearly established that prison officials must demonstrate at a minimum a rational basis for abridging the inmates' religious rights, *Cruz,* 405 U.S. at 322 n. 2, 92 S.Ct. at 1081

n. 2, rights to legal services, *Bounds*, 430 U.S. at 825, 97 S.Ct. at 1496, due process rights, *Wolff*, 418 U.S. at 555–556, 94 S.Ct. at 2974–2975, and equal protection rights, *French v. Heyne*, 547 F.2d 994, 997 (7th Cir.1976). In our view, the parameters of the "rights" that the defendants violated are sufficiently clear in light of prior decisional law. See *Walsh*, 837 F.2d at 789. As the Supreme Court noted in *Mitchell:*

> An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim.

472 U.S. at 528, 105 S.Ct. at 2816; see also *Wrigley v. Greanias*, 842 F.2d 955 (7th Cir.1988). Defendants basically ask us to assess whether or not the plaintiffs stated a claim for violation of their rights to meaningful access to the courts, full exercise of religion, due process, and equal protection. However, in attempting to distinguish their case from the landmark cases relied on by the district court, the defendants simply fail to demonstrate a legitimate rationale justifying their deprivation of rights of these protective custody inmates. Therefore the district court properly denied defendants qualified immunity.

### Eleventh Amendment

 The Eleventh Amendment to the Constitution bars suit against a state official when the state is the real party in interest. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67. This is because the relief sought against the official is really against the state in that a court decree would operate against the state and not the official personally. This absolute immunity, however, does not apply if, as here, the suit challenges the constitutionality of the official's actions. *Id.* at 102, 104 S.Ct. at 909.

 Defendants try to compare their case with *Pennhurst*, where the issue was "whether a federal court may award injunctive relief against state officials on the basis of state law." *Id.* While the district court did find that defendants' failure to comply with A.R. 808 and the *Meeks* decree violated state law, it modified the parties' proposed forms of final order to remove the references to state law as already noted. The court also expressly did not order compliance with state law. See *supra* at p. 882. Finally, the court did appropriately order relief for the federal constitutional violations.

The Supreme Court recently dismissed a petitioner's contention that *Pennhurst* applied in *Deakins v. Monoghan*, —— U.S. ——, 108 S.Ct. 523, 98 L.Ed.2d 529. There petitioners suggested that state law claims predominated in the complaint and the federal claims were minimal and unsubstantial additions. As in *Deakins*, though, a sizable portion of the relief sought in the plaintiffs' complaint in this case was intended to compensate the class for injuries allegedly sustained in violation of federal constitutional rights. Because the plaintiffs here challenged the federal constitutionally of the Department's policies, the Eleventh Amendment claim of defendants must similarly fail.

### Appointment of Special Master

The district court's final injunctive order required the appointment of a special master pursuant to Rule 53(b), Fed.R.Civ.P. This rule provides such an appointment "only upon a showing that some exceptional condition requires" this action. Defendants contend that the record in this case does not demonstrate exceptional circumstances warranting this remedy and that such an appointment is inappropriate when state governments need flexibility to comply with a court order.[8] Cf. *United States v. City of Parma*, 661 F.2d 562, 579 (6th Cir.1981), certiorari denied, 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441. Plaintiffs respond by pointing to defendants' conduct

---

**8.** Because a timely and proper objection to reference to a special master was made and later overruled, appellants can petition this Court for review on appeal. *Jack Walters & Sons Corp. v.*

*Morton Bldg.*, 737 F.2d 698, 712–713 (7th Cir. 1984), certiorari denied, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359.

during this litigation. The district court observed that defendants have demonstrated a "continued and deliberate inattention to plaintiffs' constitutional rights," have "wholly failed to take any steps or initiate any measures necessary to redress the constitutional violations identified in the opinion," and have provided "questionable ... responses to this Court's requests for a proposed plan to correct their violations of such rights" (Final Order, reproduced in defendants' Appendix, at 2–3).

It is axiomatic that judicial supervision of court orders should ordinarily be exercised directly by a judge rather than by referral to a master. Such referrals "may cause additional costs and delays when reviews by the judge are sought, ... impair supervisory consistency and cohesiveness, [and] invoke[ ] special costs in the form of compensation and expenses." Manual for Complex Litigation, Second § 20.14, pp. 11–12 (1985). Yet referrals may be appropriate "if, due to the unusual magnitude of the supervision needed in the complex case, failure to make referral would result in inattention or undue delay." *Id.;* see also W. Brazil, G. Hazard, & P. Rice, Managing Complex Litigation: A Practical Guide to the Use of Special Masters (1983).

The judge's authority to make a referral under Rule 53, if not consented to by the parties, is limited. *La Buy v. Howes Leather,* 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290. But special masters may be appointed to monitor implementation of decrees. See, *e.g., Ruiz v. Estelle,* 679 F.2d 1115, 1159–1163 (5th Cir.), amended in part and vacated in part on other grounds, 688 F.2d 266 (1982), certiorari denied, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795.

We fully acknowledge that "[t]he appointment of a special master is the exception and not the rule and [that] there must be a showing that some exceptional condition requires such an appointment." 5A Moore's Federal Practice ¶ 53.05[3] n. 42 (1987). But the appointment of a special master was particularly desirable for the final injunctive order of this case, where non-compliance with the previous district court order was emphasized. See *Gary W. v. Louisiana,* 601 F.2d 240 (5th Cir.1979). The record here is replete with instances of administrative recalcitrance. Therefore appointing a master directed to supervise and coordinate the actions of prison officials to effectuate full compliance is especially appropriate for cases such as this challenging conditions of prison confinement. See *Taylor v. Perini,* 413 F.Supp. 189 (N.D.Ohio 1976). Certainly Judge Shadur cannot be expected to neglect his busy docket to ensure that recalcitrant defendants no longer violate basic rights of this class.

Appellate courts are rightly hesitant to grant writs of mandamus directing a trial court to vacate its reference to a special master unless a clear abuse of judicial power is shown. *Chicago Housing Authority v. Austin,* 511 F.2d 82 (7th Cir. 1975); 5A Moore's Federal Procedure ¶ 53.05[3] n. 9 (1987). The defendants' cursory treatment of this issue fails to demonstrate any reversible abuse, and therefore their appeal on this issue cannot be sustained.

The district court will be expected to review with care any findings of its special master. *In re Chicago, Milwaukee, St. Paul and Pacific R.R. Co.,* 841 F.2d 789 (7th Cir.1988). The district court's standard of review of the special master's findings and recommendations will be the same as our pertinent standard of review of the district court. Thus the district court will be required to accept the special master's findings of fact unless they are clearly erroneous. *Anderson v. Mt. Clemens Pottery,* 328 U.S. 680, 689, 66 S.Ct. 1187, 1193, 90 L.Ed. 1515; *Locklin v. Day-Glo Color Corp.,* 429 F.2d 873, 876 (7th Cir.1970), certiorari denied, 400 U.S. 1020, 91 S.Ct. 582, 584, 27 L.Ed.2d 632; Fed.R.Civ.P. 53(e)(2) ("In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous."); J. Moore & J. Lucas, 5A *Moore's Federal Practice* ¶ 52.03[4], at 52–88 ("a district court's scope of review of the factual findings [sic] made by a master is comparable to that which the appellate

court has over the district court's findings of fact"). The special master's legal conclusions, however, will not be entitled to deference by the district court, *Oil, Chem. & Atomic Workers Int'l Union*, 547 F.2d 575, 580 (D.C.Cir.1976), certiorari denied, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062; J. Moore & J. Lucas, *supra*, at 52–88 to –89, and will warrant careful scrutiny due to the extensive relief sought by plaintiffs.

### Conclusion

"Judges are not wardens, but we must act as wardens to the limited extent that unconstitutional prison conditions force us to intervene when those responsible for the conditions have failed to act." *Harris v. Fleming*, 839 F.2d 1232 (7th Cir.1988). Bad prisons are not inevitable; indeed some are safe, civilized, and provide their inmates with decent work and helpful programs. See generally J. DiJulio, Jr., Governing Prisons: A Comparative Study of Correctional Management (1988). This Court realizes that where state penal institutions are involved, federal courts have reason to defer to appropriate prison authorities. *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224. The defendants, however, have failed to convince us that the cutback of essential programs and services for protective custody inmates at Stateville has a legitimate rational basis. This cutback and disparate treatment was a flagrant violation of the *Meeks* consent decree, which bound the Department to its provisions. See *Derrickson v. City of Danville*, 845 F.2d 715, 718 (7th Cir.1988). The increased administrative burden that the defendants assert a decision in plaintiffs' favor would impose upon the prison system is inconsequential when compared with the value of a proper and humane system of protective custody that may protect human life and curb inmate retaliatory violence. See *Walsh*, 837 F.2d 789, 793. Recently, this Court noted that

"Confinement in Stateville's segregation unit involves considerable isolation, sometimes for protracted periods; and the record shows, what anyway seems pretty obvious, that isolating a human being from other human beings year after year or even month after month can cause substantial psychological damage, even if the isolation is not total."

*Davenport v. DeRobertis*, 844 F.2d 1310, 1313 (7th Cir.1988). Plaintiffs in this case, in attempting to secure their physical safety through assignment to protective custody status by the warden, have been punished and treated like those who have violated prison rules and have periodic behavior problems. Depriving plaintiffs of meaningful access to the courts, free exercise of religion, and equal treatment regarding living conditions and programs has not been rationally related to defendants' articulated security concerns. Cf. *Martin, supra*, at 1457 (segregation a legitimate response to a security risk).

■ In Section 1983 cases, prisoners may receive remedies comparable to all civil litigants. District courts may award damages, see *Madison County Jail Inmates v. Thompson*, 773 F.2d 834, 844 (7th Cir.1985), as well as order appropriate injunctive relief to prevent any continuing deprivation of an inmate's constitutional rights. Cf. *Preiser v. Newkirk*, 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272. The district court has yet to conduct any assessment of compensatory or punitive damages and still has to order a reasonable remedial plan. A knowledgeable and impartial special master to implement a just remedy consistent with the needs of prison security and legitimate penological goals should assure compliance with the court's ultimate decision.

AFFIRMED.

FLAUM, Circuit Judge, concurring in the result.

I must reluctantly concur in the judgment of the court, and therefore write separately. The defendants' litigation strategy in a case of significant public importance has dictated the outcome that we are required to affirm. Their inappropriate form of advocacy and intransigence regarding efforts to effectuate a remedy compel us to uphold an opinion which sweeps very

broadly. Indeed, defendants have brought upon themselves the burden of affording to protective custody inmates rights which are not necessarily indicated by recent Supreme Court precedent.

Although the record clearly establishes that the inadequate library privileges allowed to plaintiffs unconstitutionally restrict their right of access to the courts, in my judgment plaintiffs' success on their other claims was far from inevitable. The protective custody inmates' first amendment and due process arguments about the scope of their rights to religious services, vocational and educational programs, jobs, recreation, and living conditions called for a more reasoned rebuttal. But the prison officials were unwilling (or impervious to the need) to articulate credible justifications for their perhaps permissible treatment of these inmates. The defendants apparently failed to advance effectively the lack of reasonable and feasible alternatives. Although we customarily defer to their professional judgment in matters of administration, prison officials whose actions are challenged cannot avoid court scrutiny by reflexive, rote assertions that existing conditions are dictated by security concerns and that the cost of change is prohibitive.

The defendants' and their witnesses' approach caused the district judge to find them utterly lacking in credibility. They appear to have ushered the district court into virtually insulating his findings from review; as the majority points out, we may rarely hold such credibility determinations clearly erroneous. We may never ascertain to what extent these findings were "punitive." The defendants certainly invited them by failing to engage the court in any persuasive discussion of penological objectives and alternatives. It is discouraging, to say the least, that a most critical state agency has been found so sorely wanting as a litigant by a United States District Court. *See Williams v. Lane*, 646 F.Supp. 1379, 1402–05 (N.D.Ill.1986).

In particular, the defendants' stance once the court decided their liability made the extreme remedy affirmed today almost inevitable. In the opinion of the district judge, the defendants made no substantial attempt at good faith compliance with the court's directives once liability was established. By refusing to meaningfully comply with the district court's request for aid in fashioning a remedy, defendants ensured a harsher result than would otherwise have been warranted. While the appointment of a special master to implement the court's directives is an extraordinary and disfavored recourse, the defendants and their counsel forced the district judge's hand.

Courts must of course recognize their limited competence in the troubled and complicated area of prison administration. However, prison administrators alleged to have violated inmates' rights must meet such challenges with edifying and illuminating rejoinders drawn from their unique expertise, not with the modest responses advanced in this litigation.