James HENDRIX; and Gerald
Cobbs, Plaintiffs,

v.

Daniel F. EVANS, Jr.; John T. Shettle;
Cloid Shuler; Jack Duckworth; and
Indiana Attorney General, Defendants.

Civ. No. S 84–625.

United States District Court,
N.D. Indiana,
South Bend Division.

March 15, 1989.

James Hendrix and Gerald Cobbs, Michigan City, Ind., pro se.

David Arthur, Indianapolis, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

The complaint in this case was originally filed *pro se* on October 12, 1984, by five inmates incarcerated at the Indiana State Prison in Michigan City, Indiana (ISP). Three of the original plaintiffs were dismissed from this action pursuant to order of this court on March 14, 1986, for failing to appear at a scheduled pretrial conference. The remaining plaintiffs, James Hendrix and Gerald Cobbs, purport to state claims under 42 U.S.C. § 1983 and invoke this court's jurisdiction under 28 U.S.C. §§ 1331, 1343(3) and (4).

The plaintiffs have filed a Motion for Summary Judgment and a Motion for Judgment on the Pleadings. The court will construe the latter motion as a second or amended motion for summary judgment pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Fed.R.Civ.P.). The defendants have filed a Cross–Motion for Partial Summary Judgment, which demonstrates the necessary compliance with the mandates of *Lewis v. Faulkner*, 689 F.2d 100 (7th Cir.1982). Additionally, defendants have filed a memorandum in opposition to plaintiffs' summary judgment motions. The plaintiffs have not filed a response to defendants' Cross–Motion for Partial Summary Judgment. Therefore, this case is now ripe for ruling.

## I.

### *Introduction*

This case involves conditions of plaintiffs' confinement in K–Dormitory (maximum security, out-custody) at the ISP. The plaintiffs allege a myriad of constitutional violations and seek monetary, declaratory, and injunctive relief. Plaintiff James Hendrix, however, is no longer incarcerated at the ISP. He was transferred to the Indiana Pendleton Reformatory on November 17, 1986. Thus, plaintiff Hendrix no longer has standing to assert any type of injunctive relief. Nonetheless, the court will address his claims concerning alleged constitutional violations that occurred while he was incarcerated at the ISP.

The named defendants are the Chairman of the Indiana Board of Corrections, Daniel F. Evans, Jr.; the Commissioner of the Indiana Department of Corrections, John T. Shettle; a Deputy Commissioner of Corrections, Cloid Shuler; and the Superintendent of the ISP, Jack Duckworth.

Consistent with *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), this court has given the plaintiffs' complaint and their motions for summary judgment and judgment on the pleadings an extremely liberal interpretation in order to extract all claims raised and argued by the plaintiffs. *See also Smith v. Fairman,* 862 F.2d 630 (7th Cir.1988); *Abdul–Wadood v. Duckworth,* 860 F.2d 280 (7th Cir. 1988); *Cain v. Lane,* 857 F.2d 1139 (7th Cir.1988). This is necessary because claims addressed in plaintiffs' motion for summary judgment are not addressed in their motion for judgment on the pleadings and vice versa. The inconsistency has placed a burden on this court to, in effect, incorporate both motions in order to create one single motion. Additionally, this court notes that the defendants have had this same burden in attempting to respond to plaintiffs' motions.

Essentially, the following claims for relief are raised in the plaintiffs' complaint and argued in their motions for summary judgment and judgment on the pleadings:

(1) that the First Amendment rights of plaintiff James Hendrix were violated when defendants: (a) refused to support and fund his lobbying efforts; (b) prohibited him from publishing "leaflets" to distribute to the general public; and (c) prohibited him from attending Lifers' organization meetings;

(2) that the due process rights of plaintiff James Hendrix were violated when defendants prohibited him from attending Lifers' organization meetings;

(3) that the due process rights of plaintiff Gerald Cobbs were violated when defendants refused to permit him to participate in a continuing legal education program at a local university;

(4) that the equal protection rights of plaintiff Gerald Cobbs and other K–Dormitory inmates were and are being violated by an alleged prison policy which prohibits K–Dormitory inmates from participating in educational and vocational programs;

(5) that the due process rights of plaintiffs were and are being violated in that: (a) the Inmate Trust Fund prohibits them from earning interest on their personal funds and (b) its operating procedures prohibit them from withdrawing their personal funds to send to persons who are not in their immediate family (prospective relief is now limited to plaintiff Cobbs);

(6) that the equal protection rights of plaintiff Gerald Cobbs and other K–Dormitory inmates were and are being violated by an alleged prison policy which denies K–Dormitory inmates equal access to recreational supplies purchased from the Inmates' Recreation Fund; and

(7) that the Eighth Amendment rights of plaintiffs were and are being violated by the living conditions in K–Dormitory (prospective relief is now limited to plaintiff Cobbs).

For the reasons set forth below, the court grants defendants summary judgment as to all claims above with the exception of claims (4) and (7). With respect to plaintiff Cobbs' equal protection claim (denial of academic and vocational training),

plaintiffs' motions for summary judgment and judgment on the pleadings are denied. As will be discussed later, this claim is reserved for further proceedings consistent with this order. In regard to the Eighth Amendment claim, defendants concede that there are genuine issues of material fact remaining as to the conditions of confinement at K–Dormitory. Consequently, defendants are not seeking summary judgment in their favor on this issue.

## II.

### Summary Judgment

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P.; *accord Arkwright–Boston Mfg. Mutual Ins. Co. v. Wausau Paper Mills Co.*, 818 F.2d 591, 593 (7th Cir.1987). A material question of fact is a question which will be outcome-determinative of an issue in that case. *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984).

Recently the Supreme Court of the United States took the opportunity to address Rule 56, Fed.R.Civ.P. In two cases decided on the same day, the Court expanded the scope of the application of Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

After *Celotex* it is clear that a non-moving party may not rest on its pleadings to avoid summary judgment. 106 S.Ct. at 2554. *See also Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33 (D.C.Cir.1987). The initial burden is on the moving party to demonstrate " 'with or without supporting affidavits' " the absence of a genuine issue of material fact, and that judgment as a matter of law should be granted in the moving party's favor. *Celotex*, 106 S.Ct. at 2553 (quoting Rule 56). Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.' " *Id.* In *Anderson*, the Court held that what facts are material in a specific case shall be determined by the substantive law controlling that case or issue. 106 S.Ct. at 2510. In addition, the Court went on to interpret Rule 56 as requiring that the courts analyze summary judgment motions utilizing the standard of proof relevant to that case or issue. *Id.* at 2512–2513. For recent academic insight into *Celotex* and *Anderson*, see Childress, *A New Era For Summary Judgments: Recent Shifts at the Supreme Court*, 116 F.R.D. 183, 194 (1987), where the author states:

> The recent Supreme Court cases likely require that summary judgment be more readily granted.... This emerging trend signals a new era for summary judgments, one in which the old presumptions are giving way to a policy of balancing and efficiency, and the mechanism is more appropriate to double as a sufficiency motion—allowing some sort of trial itself on the paper record.

For the judicial epilogue of *Celotex*, see *Catrett v. Johns–Manville Sales Corp.*, *supra*. A recent object lesson applying these ideas is found in *Richardson v. Penfold*, 839 F.2d 392 (7th Cir.1988). For an exact and recent analysis on this subject, see Friedenthal, *Cases on Summary Judgment: Has There Been a Material Change in Standards?* 63 Notre Dame L.Rev. 770 (1988).

## III.

### Eleventh Amendment

█ It is clear from plaintiffs' complaint that the defendants are being sued in their individual and official capacities. The Eleventh Amendment states as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or

prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

*See Kashani v. Purdue University*, 813 F.2d 843 (7th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 141, 98 L.Ed.2d 97 (1987); *Owen v. Lash*, 682 F.2d 648 (7th Cir.1982); *Sheets v. Indiana Department of Corrections*, 656 F.Supp. 733 (S.D.Ind. 1986). For recent authority consistent with *Kashani, supra,* see *Shannon v. Bepko*, 684 F.Supp. 1465 (S.D.Ind.1988). Any and all damage claims against defendants in their official capacities are now DISMISSED under the mandates of the Eleventh Amendment of the Constitution. This re-confirms the Order to this effect on November 14, 1986.

## IV.

### *Claims*

A. First Amendment—James Hendrix

Plaintiff James Hendrix first complains that the defendants somehow prohibited, or at least interfered with, his lobbying efforts for legislative reform. His allegations as to how he was prohibited from lobbying are obscure and indefinite. This court, nevertheless, has attempted to categorize this claim into three allegations. Both the plaintiff and defendants have moved for summary judgment on the First Amendment claim. For the reasons that follow, the court concludes that defendants are entitled to judgment on this claim as matter of law.

### 1. *Refusal to Support and Fund Lobbying Efforts*

█ The first allegation involves plaintiff's request for support and funding. It is not disputed that from 1976 to 1984 the plaintiff was president of the "Lifer's United for Penal Progress", which is a DOC-approved inmate organization. As president, this plaintiff was active in effecting legislative reform of Indiana parole laws and in reforming living conditions at the ISP, see *Hendrix v. Faulkner*, 525 F.Supp. 435 (N.D.Ind.1981) *aff'd in part and vacated in part*, 715 F.2d 269 (7th Cir.1983), *cert. denied*, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984).[1]

The affidavit and exhibits submitted by the plaintiff demonstrate that he was very active in lobbying legislators in order to effect legislative reform. Specifically, in the fall of 1983, he worked closely with at least two state senators in drafting proposed legislation for submission to the Indiana General Assembly. The proposed legislation was to provide incentive credits for criminal offenders who were successful in completing educational and vocational training programs.

It is also not disputed that in the latter part of 1983, the plaintiff requested funding from DOC in order to support his lobbying efforts. It is not clear whether the funding would come from DOC or the Lifers' organization. This may be immaterial, however, since DOC more than likely controlled the funds of the Lifers' organization. It is undisputed that in a letter dated December 15, 1983, defendant Cloid Shuler, acting on behalf of DOC, refused to support and apparently fund plaintiff's lobbying efforts. Plaintiffs' Motion for Summary Judgment, Exhibit A–3; Plaintiffs' Motion for Judgment on the Pleadings, Hendrix Affidavit ¶ 5.

---

**1.** Additionally, the plaintiff has been involved in the following litigation of which this court takes judicial notice:

*Jones v. Hamelman*, 869 F.2d 1023 (7th Cir. 1989) (disqualified as an expert witness);

*Mauricio v. Bronnenberg*, 668 F.Supp. 1206 (N.D.Ind.1986), *aff'd*, 826 F.2d 1068 (7th Cir. 1987) (lay advocate for *pro se* plaintiff);

*Hendrix v. Indiana State Public Defender System*, 581 F.Supp. 31 (N.D.Ind.1984) (challenging public defender system);

*Hendrix v. Duckworth*, No. S83–48 (N.D.Ind. June 15, 1983), *aff'd*, 738 F.2d 442 (7th Cir. 1984) (challenges credit time statutes);

*Hendrix v. Duckworth*, No. S81–190 (N.D.Ind. Oct. 15, 1981), *aff'd*, 720 F.2d 682 (7th Cir. 1983) (habeas corpus petition);

*Hendrix v. State*, 418 N.E.2d 1161 (Ind.1981) (post-conviction relief appeal); and

*Hendrix v. State*, 262 Ind. 309, 315 N.E.2d 701 (1974) (appeal of conviction).

The plaintiff appears to argue that the defendants' refusal to support and fund his lobbying efforts somehow prohibited him from exercising his First Amendment right to freedom of speech in the form of political expression. It is well-settled that a prisoner is not stripped of all First Amendment rights upon entering the penal system. However, " '[a] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.' " *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977) (quoting *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)); *see also Williams v. Lane*, 851 F.2d 867, 877 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989). This court, therefore, must balance the competing interests of the ISP with plaintiff Hendrix's First Amendment rights.

The Supreme Court of the United States has declared the standard to be used in reviewing constitutional claims of prisoners that require such a balancing: when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). This circuit summarized the factors set forth by the Supreme Court which must be considered when balancing the competing interests:

(1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule;

(2) whether there are alternative means of exercising the right in question that remain available to prisoners;

(3) the impact accomodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and

(4) although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable.

*Hadi v. Horn*, 830 F.2d 779, 784 (7th Cir. 1987) (citing *Turner v. Safley*, 107 S.Ct. at 2262). The realistic difficulty of applying the *Turner-O'Lone* factors is evident in their progeny in this circuit. Most recently, see *Johnson-Bey v. Lane*, 863 F.2d 1308 (7th Cir.1988) and the cases there collected.

Defendant Shuler's letter clearly sets forth the reasons why the Department of Corrections (DOC) refused to fund plaintiff's lobbying efforts. DOC was concerned that funding plaintiff's lobbying efforts would violate Indiana law. The letter noted that Indiana Code § 2-7-5-6 prohibits any person who has been convicted of a felony or any person who is in prison from serving as a lobbyist. Defendant Shuler expressly mentioned in his letter that DOC was concerned that the plaintiff's efforts, if funded, would fall within the ambit of the statute.

This court is struggling with the notion of how defendants' refusal to support and fund the lobbying efforts of the plaintiff implicates any First Amendment free speech rights, especially in light of Indiana Code § 2-7-5-6 which clearly prohibits an inmate from serving as a lobbyist. This court is not about to determine the constitutionality of this statute. It is undisputed that the plaintiff was not prohibited from meeting with legislators. Plaintiffs' Motion for Summary Judgment, Exhibit A. It is also undisputed that the plaintiff was not prohibited from writing legislators. *Id.* It is clear from Exhibit A that correspondence between legislators and the plaintiff was occuring and was not censored or disapproved of by DOC. In his letter, defendant Shuler even encouraged the plaintiff to correspond with legislators and even recommended to the plaintiff that there may be legislators who would support his proposed legislation. *Id.* at Exhibit A-3.

Assuming *arguendo* that the defendants somehow infringed upon the plaintiff's freedom of speech in the form of political expression, their actions, nevertheless,

were reasonably related to legitimate penological interests. *See Turner v. Safley,* 107 S.Ct. at 2261; *O'Lone v. Estate of Shabazz,* 107 S.Ct. at 2404. First, the defendants were justly concerned that funding plaintiff's lobbying efforts would violate Indiana law. This is a legitimate concern of DOC and their actions were a reasonable, if not *necessary,* response to those concerns. Secondly, the plaintiff clearly had alternative methods of exercising his right to petition government—methods even more direct than DOC support and funding. He retained the ability to correspond and meet with legislators. Furthermore, there is no evidence that he was prohibited from corresponding with media representatives and individual citizens. DOC even encouraged him to find a sponsor in the general assembly. In reviewing Exhibit A, it appears that there was even support in the Indiana General Assembly for plaintiff's proposed legislation, thereby eliminating the need for lobbying funds. Thirdly, the impact of accommodating plaintiff's efforts would have been the possibility that Indiana law was being violated. Clearly, DOC is not required to take such risks in order to accommodate plaintiff's free speech rights, assuming free speech rights are implicated by this incident. Lastly, it appears to this court that DOC did not have any easy alternatives. DOC had no choice but to deny such a request for funding. The *Turner–O'Lone* factors have been analyzed and the balance weighs heavily in favor of the defendants. Hence, the defendants did not infringe upon any of plaintiff's First Amendment rights when they refused to support and fund his lobbying efforts.

### 2. Prohibiting the publication and distribution of "leaflets"

■ The second allegation involves the publication and distribution of "leaflets." It is not disputed that at some point in time, DOC prohibited the plaintiff from publishing "leaflets" to be distributed to the general public. Plaintiffs' Motion for Judgment on the Pleadings, Hendrix Affidavit ¶ 3. The "leaflets" were to inform the general public about the proposed legislation on the subject of incentive credits. The facts and circumstances surrounding this incident are vague at best.

This court is hard pressed to find a constitutional violation surrounding this incident. Prohibiting correspondence to outsiders does implicate First Amendment rights more so than the refusal to support and fund lobbying efforts. The court does not have the benefit of knowing DOC's rationale for prohibiting the publication and distribution of "leaflets" to the general public. Nevertheless, plaintiff's claim is unfounded.

Defendants cite *Jones v. North Carolina Prisoners' Labor Union, Inc., supra,* in support of their contention that prohibiting the publication and distribution of "leaflets" is constitutional. *Jones* involved a prisoner union which was prohibited from bulk mailing its publications to prisoners in the state. In *Jones,* prison officials claimed that bulk mailing is fraught with security problems and that it would be impossible for prison officials to inspect every piece of mail to insure that no contraband had been placed inside the publication. *Jones,* 433 U.S. at 131 n. 8, 97 S.Ct. at 2540 n. 8. Conversely, the Supreme Court noted that bulk mail is cheaper and more convenient for the prisoner union. *Id.* at 130, 97 S.Ct. at 2540. The court concluded that losing these cost advantages did not fundamentally implicate free speech values. *Id.* at 130–131, 97 S.Ct. at 2540–41. The court reasoned that other avenues of informational flow remained available. *Id.* at 131, 97 S.Ct. at 2540. The court also emphasized that the state was not prohibiting individual mailings between outsiders and individual inmates, which would clearly have First Amendment ramifications. *Id.* at 131 n. 8, 97 S.Ct. at 2540 n. 8.

Although not factually similar, the analysis in *Jones* provides this court with guidance in determining whether the defendants infringed upon plaintiff's First Amendment rights. As in *Jones,* "mail rights are not themselves implicated" in this case. *Id.* at 130, 97 S.Ct. at 2540. Rather, the defendants have prohibited a form of distribution. In light of *Jones,*

defendants have not infringed upon plaintiff's First Amendment right to correspond with the general public.

Furthermore, when examining the *Turner-O'Lone* factors, the defendants' actions were clearly reasonable and related to legitimate penological interests. The record is silent as to the defendants' interest in prohibiting the publication and distribution of these "leaflets." Their interest could have been for security reasons. *See Jones,* 433 U.S. at 131 n. 8, 97 S.Ct. at 2540 n. 8. Nonetheless, there were clearly alternative methods for informing the general public about legislative reform. Again, there is no evidence that the defendants restricted in any form or manner the right of the plaintiff to individually correspond with citizens, media representatives, or legislators. Furthermore, if the defendants had accommodated the plaintiff by allowing him to publish the "leaflets" to distribute to the general public, the system for processing out-going mail at the prison would have become overburdened and fraught with security problems. Lastly, it appears to this court that the defendants had no other alternative but to prohibit this mass mailing since the only other method of mailing was individual mailing, which was clearly not prohibited.

With respect to this allegation, the plaintiff also argues that this court must consider the First Amendment rights of the general public. The plaintiff cites *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) in support of his argument. Plaintiff's reliance on *Martinez* is misplaced. *Martinez* involved the *censorship* of correspondence between the general public and inmates. Clearly, censorship of mail between outsiders and inmates raises serious First Amendment rights of not only the inmates but of the outsiders. However, censorship is not an issue in this case. There is no evidence that the defendants censored any of plaintiff's correspondence.

Like the refusal to support and fund his lobbying efforts, the defendants did not hamper the ability of the plaintiff to communicate his desires for legislative reform when they prohibited him from publishing and mailing "leaflets." Instead, the defendants merely prohibited one of the ways in which the plaintiff could voice his proposal. Thus, the plaintiff's First Amendment rights were not violated when the defendants prohibited him from publishing "leaflets" to distribute to the general public.

### 3. Lifers' organization meetings

■ The last allegation giving rise to plaintiff's First Amendment claim involves his attempts to participate in meetings of the Lifers' organization. It is not disputed that the plaintiff was voluntarily transferred in 1984 to K–Dormitory located outside the prison walls. K–Dormitory is the maximum security, out-custody program at the ISP. Defendants' Answer ¶ 8. It is also undisputed that subsequent to plaintiff's transfer, defendant Duckworth apparently issued orders forbidding the plaintiff from working, communicating, or participating in any way with the Lifers' organization inside the prison walls. Plaintiff's Motion for Summary Judgment, Exhibit B.

Plaintiff thus argues that the defendants violated his freedom of association as protected by the First Amendment. This claim is totally groundless. Associational rights can be restricted in the prison setting, and prison officials are given great deference by courts in this area. In *Jones v. North Carolina Prisoners' Labor Union, Inc.,* the Supreme Court discussed associational rights in the context of a prison:

> Perhaps the most obvious of the First Amendment rights that are necessarily curtailed by confinement are those associational rights that the First Amendment protects outside of prison walls. The concept of incarceration itself entails a restriction on the freedom of inmates to associate with those outside of the penal institution. Equally as obvious, the inmate's "status as a prisoner" and the operational realities of a prison dictate restrictions on the associational rights among inmates.

433 U.S. at 125–126, 97 S.Ct. at 2538. The court further explained:

First Amendment associational rights, while perhaps more directly implicated by the regulatory prohibitions, likewise must give way to the reasonable considerations of penal management. As already noted, numerous associational rights are necessarily curtailed by the realities of confinement. They may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that such associations, whether through group meetings or otherwise, possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment. As we noted in *Pell v. Procunier, supra,* [417 U.S.] at 823 [94 S.Ct. at 2804], "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."

*Id.* at 132, 97 S.Ct. at 2541.

It is quite apparent from the record that the plaintiff's inability to attend Lifers' organization meetings inside the prison walls coincided with his voluntary transfer to K–Dormitory outside the prison walls. In fact, the defendants argue that the plaintiff had to make a choice between assignment to K–Dormitory, which is a privilege, or staying inside the prison walls so that he could attend the meetings. He opted for the former. Thus, he created the dilemma of which he now complains.

The defendants have not specifically set forth why the plaintiff was prohibited from attending Lifers' organization meetings inside the prison. However, reasonable inferences can be drawn from the record that prison policy at the ISP prohibits in-custody and out-of-custody inmates from associating and interacting with one another. Security reasons justify such practice. Prohibiting the plaintiff from attending the Lifers' meetings inside the prison is consistent with this practice. This court previously held that First Amendment associational rights of prisoners at the ISP could constitutionally be limited when there is a potential security threat to the institution. *Childs v. Duckworth,* 509 F.Supp. 1254,

1262–1263 (N.D.Ind.1981), *aff'd,* 705 F.2d 915, 921 (7th Cir.1983).

The Supreme Court in *Jones* upheld a ban on group meetings of a prisoner union as being rationally related to reasonable objectives of prison administration. 433 U.S. at 129, 97 S.Ct. at 2539. The actions of the defendants in this case do not even rise to the level of a total ban on group meetings. If a total ban on prisoner meetings is not inconsistent with an inmate's First Amendment right to associate, it certainly would follow that the defendants did not violate plaintiff's right to associate when they prohibited him from attending Lifers' organization meetings inside the prison.

In applying the *Turner–O'Lone* factors, there is no evidence in the record that the plaintiff was deprived of all means of association. Rather, he was prohibited from associating with only a limited class of inmates—those housed inside the prison walls. Nothing in the record demonstrates that he was prohibited from meeting with Lifers' organization members in K–Dormitory. Furthermore, if the defendants had accommodated the plaintiff, additional burdens would have been placed on prison guards supervising the in-custody and out-of-custody programs when transferring the plaintiff to and from the inside of the prison. *See O'Lone v. Estate of Shabazz,* 107 S.Ct. at 2405. Such transfers would have created additional security problems. Thus, this court concludes that the plaintiff's First Amendment right to associate was not violated when the defendants prohibited him from attending Lifers' organization meetings inside the prison.

In light of plaintiff's nebulous allegations with respect to his First Amendment claim, the court has attempted to categorize the incidents which he claims violated his First Amendment rights. For the foregoing reasons, the court concludes that no genuine issue of material facts exist with respect to the First Amendment claim and that defendants are entitled to judgment as a matter of law. Accordingly, the defendants' motion for summary judgment on

this claim should be, and hereby is GRANTED. SO ORDERED.

### B. Due Process—James Hendrix

■ Plaintiff James Hendrix also contends that his procedural due process rights were violated when the defendants prohibited him from attending Lifers' organization meetings. Complaint at 12–13; Plaintiffs' Motion for Summary Judgment at 3–4. Framed in better terms, it appears the plaintiff is alleging that the creation of the Lifers' organization and its policy statements created an expectation that membership would not be withdrawn absent some type of procedural due process. The defendants have not specifically argued this issue in their summary judgment motion. However, the defendants did "move the court to enter summary judgment in their favor on *all* issues, except the issue as to conditions of confinement at K–Dormitory...." Defendants' Cross–Motion for Partial Summary Judgment (emphasis added). In light of this statement, therefore, the court will address the merits of this claim since the facts are undisputed.

The plaintiff is asserting that he had a protected interest in membership in the Lifers' organization and that this interest was violated when his membership was withdrawn. This novel argument has no support under due process analysis. First of all, there is no evidence in the record that plaintiff's membership was terminated. On the contrary, it appears from the record that he was still a member of the Lifers' organization despite his subsequent transfer to K–Dormitory. But as a member located in K–Dormitory, he was prohibited from attending meetings inside the prison walls.

Even assuming *arguendo* that plaintiff's membership in the Lifers' organization was terminated, his due process claim is unfounded. In his Motion for Summary Judgment at page 4, the plaintiff cites the following language apparently from his inmate handbook:

"there are various organizations and activities which are designed for your benefit and your getting involved in one or more of these may give you the opportunity for self-improvement. Your participation is encouraged, however, it is not mandatory."

\*       \*       \*       \*       \*       \*

"Lifer's United for Penal Progress membership is open to all inmates. The membership of this progressive organization is known to offer its services for the progress and betterment of conditions of all other inmates as well as themselves. For further information you may submit your name to a member of the Lifers or Custodial Supervisor."

This circuit has recognized that a prisoner may have a due process right under the Fourteenth Amendment as a result of entitlements created by prison regulations and by official policies. *Stringer v. Rowe,* 616 F.2d 993, 996 (7th Cir.1980); *Durso v. Rowe,* 579 F.2d 1365, 1369 (7th Cir.1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). This court in no way finds any language above which gives rise to a legitimate expectation in remaining a member of the Lifers' organization and to a protected interest in such membership. *See Hewitt v. Helms,* 459 U.S. 460, 471–472, 103 S.Ct. 864, 871–72, 74 L.Ed.2d 675 (1983). And of course, this is assuming that the above language is considered official DOC policy. Thus, the plaintiff was not entitled to any protections afforded by procedural due process when he was prohibited from attending meetings of the Lifers' organization.

For the foregoing reasons, the court concludes that no genuine issue of material facts exist with respect to this claim and that defendants are entitled to judgment as a matter of law. Accordingly, the defendants' motion for summary judgment on this claim should be, and hereby is GRANTED. SO ORDERED.

### C. Due Process—Gerald Cobbs

■ Plaintiff Gerald Cobbs contends that his due process rights guaranteed by the Fourteenth Amendment were violated when the defendants denied his request to participate in a continuing legal education program at a local university. Plaintiffs'

Motion for Judgment on the Pleadings, Hendrix Affidavit ¶ 6. Even though it appears that plaintiff James Hendrix is speaking on behalf of plaintiff Gerald Cobbs, it is not disputed by the defendants that plaintiff Cobbs made a request and that the request was denied. Both the plaintiff and defendants have moved for summary judgment on this claim.

The defendants argue that they have unlimited discretion in determining whether to grant or deny such a request for release to participate in academic or vocational training. On the other hand, plaintiff Cobbs asserts that there is a state-created right for offenders who meet certain criteria to participate in study release programs. Hence, the criteria once met gives rise to a liberty interest protected by due process.

Indiana Code §§ 11–10–8–2 and 11–10–8–3 are cited by the plaintiff as creating a protected right to participate in study release programs. These statutes provide in full:

**11–10–8–2   Establishment of program**

Sec. 2.   The department shall establish a minimum security release program in which eligible committed offenders *may* be temporarily released from custody to:

(1) work;

(2) conduct a business or other self-employed occupation including housekeeping or attending to family needs;

(3) attend an academic or vocational training institution or program;

(4) obtain medical, psychiatric, or psychological treatment, including treatment for drug addiction, or alcoholism; or

(5) accomplish other purposes consistent with programs of the department.

**11–10–8–3   Assignment to program; requirements**

Sec. 3.   (a) *Before an offender may be assigned to a minimum security release program:*

(1) the offender must be assigned to a minimum security classification in accord with IC 35–38–3 (any change in the degree of security, from minimum to a higher degree, whether the change oc-

curs before or after assignment to a release program, renders the offender ineligible for participation in the release program, and the department shall take appropriate action for the offender's immediate removal from the release program and reassignment to a facility or program consistent with the offender's degree of security assignment); and

(2) the department must find that:

(A) the offender is likely to respond affirmatively to the program;

(B) it is reasonably unlikely that the offender will commit another crime while assigned to the program; and

(C) the offender demonstrates reading and writing skills that meet minimum literacy standards:

(i) developed by the department with the assistance of the advisory adult literacy coalition established by the governor under IC 20–11–3; and (ii) established under rules adopted by the department under IC 4–22–2.

(b) The minimum literacy standards adopted by the department under subsection (a)(2)(C) must provide that an offender is exempt from those standards if the department determines that:

(1) the offender is unable to meet the minimum literacy standards as a result of a handicap; or

(2) the length of the offender's sentence prevents the offender from achieving the minimum literacy standards before the expiration of the offender's sentence.

Ind.Code Ann. §§ 11–10–8–2 and 3 (West 1982 & Supp.1988) (emphasis added).

The threshold question then becomes whether denying plaintiff Cobbs' request to participate in a continuing education program infringed a liberty interest protected by the Due Process Clause. Following the decision in *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), this circuit has held that a prisoner is not constitutionally entitled to procedural protections unless "... he has some justifiable expectation rooted in state law that the

challenged action will not be taken absent the occurrence of a specified factual predicate." *Arsberry v. Sielaff,* 586 F.2d 37, 45 (7th Cir.1978) (citing *Montanye v. Haymes,* 427 U.S. 236, 242–243, 96 S.Ct. 2543, 2547–48, 49 L.Ed.2d 466 (1976)). In *Meachum,* the Supreme Court of the United States held that a state could create a liberty interest "by statute, by rule, or regulation...." 427 U.S. at 229, 96 S.Ct. at 2540. Plaintiff Cobbs argues that by virtue of the statutes at issue, there was created a justifiable expectation that he would be allowed to participate in continuing education programs. Therefore, he maintains that he was entitled to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that those state-created rights are not arbitrarily abrogated. *See Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).

The existence of a statutorily created liberty interest depends on the statutory language and "must be decided on a case-by-case basis." *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979). The state must use "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed ... and that [the challenged action of prison authorities] will not occur absent specified substantive predicates...." *Hewitt v. Helms,* 459 U.S. at 471–472, 103 S.Ct. at 871. "The test for whether a statutory or regulatory procedure creates a protectable due process interest, then, hinges on the actual language used by the legislature or agency." *Cain v. Lane,* 857 F.2d at 1144. *See also Culbert v. Young,* 834 F.2d 624, 628 (7th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1296, 99 L.Ed.2d 506 (1988) (no liberty interest created by permissive rather than mandatory language).

The key language in Indiana Code § 11–10–8–2 provides that "[t]he department shall establish a minimum security release program in which eligible committed offenders *may* be temporarily released from custody to ... (3) attend an academic or vocational training institution or program." (Emphasis added.) Indiana Code § 11–10–8–2 does provide that "[t]he department *shall* establish a minimum security release program...." (Emphasis added.) This language, however, only mandates that a release program exist. Once the program is established, there exists no limitation on DOC's authority to grant or deny release for academic or vocational training.

In regard to Indiana Code § 11–10–8–3, the relevant language provides that "[b]efore an offender *may* be assigned to a minimum security release program...." (Emphasis added.) This statute merely establishes the minimum requirements an offender must satisfy in order to qualify for a minimum security release program. Even if an offender satisfies the minimum qualifications, there exists no limitation on DOC's authority to grant or deny release.

The defendants note that this court reviewed a predecessor work release statute in 1981 and found that there was no due process issue present or implicated by that statute. *See Young v. Hunt,* 507 F.Supp. 785 (N.D.Ind.1981). The relevant portion of the statute at issue in *Young* provided that "[t]he department of correction is authorized and directed to establish a work release plan under which an eligible prisoner *may* be released from actual custody...." *Id.* at 788 (emphasis in original) (citing Ind.Code § 11–7–9–4 (repealed by Acts 1979, P.L. 120, Sec. 22)). The language in the statute in *Young* was found by this court to be permissive, thereby creating no legitimate expectation of release. *Id.* at 789. The wording of the statute in *Young* closely resembles Indiana Code § 11–10–8–2. Thus, this court is guided by its analysis in that case in determining that the statutes in the present case do not create a protected liberty interest.

In light of these considerations, Indiana Code §§ 11–10–8–2 and 11–10–8–3 do not create a protectable entitlement. The use of the permissive term "may" in the statutes makes the decision to deny educational training discretionary with prison administrators. The statutory scheme does not

employ the language of "must", "shall" or "will". *See Hewitt v. Helms*, 459 U.S. at 471–472, 103 S.Ct. at 871. The state has merely established a release program. The statutes provide the plaintiff with no more than a mere hope that he will be released for academic training. *See Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Therefore, the plaintiff was not entitled to due process protections guaranteed by the Fourteenth Amendment.

For the foregoing reasons, the court concludes that no genuine issue of material facts exist with respect to plaintiff's due process claim and that defendants are entitled to judgment as a matter of law. Accordingly, defendants' motion for summary judgment with respect to this claim should be, and is hereby GRANTED. SO ORDERED.

### D. Equal Protection—Gerald Cobbs

■ The plaintiffs next allege that the defendants not only denied plaintiff Cobbs' request for educational training but that they deny educational and vocational opportunities to all offenders assigned to K–Dormitory. Plaintiffs' Complaint at 4, 13; Plaintiffs' Motion for Summary Judgment at 2; Plaintiffs' Motion for Judgment on the Pleadings at 6. In fact, it is alleged that there existed, and may still exist, a prison policy which denies educational opportunities to offenders assigned to K–Dormitory. Plaintiffs' Motion for Judgment on the Pleadings, Hendrix Affidavit ¶ 6; Pretrial Conference Transcript, Jan. 28, 1986, at 3. Plaintiffs complain that denying K–Dormitory inmates the opportunity to participate in academic and vocational training programs while granting inmates housed inside the prison walls the same opportunities violates the Equal Protection Clause of the Fourteenth Amendment. Vague reference was made to this claim in the plaintiffs' complaint. However, in the spirit of *Haines v. Kerner, supra*, the court concludes that the claim has been properly raised for adjudication.

Clearly, plaintiff James Hendrix no longer has standing to argue this equal protec-

tion claim, assuming he had standing initially. Still, it is undisputed that plaintiff Gerald Cobbs was confined in K–Dormitory when his request for academic training was denied. Furthermore, plaintiff Cobbs is presently confined in K–Dormitory. Thus, he still has standing to argue this claim.

All this court has before it are allegations in plaintiffs' complaint and motions that the defendants prohibited, and possibly still prohibit, K–Dormitory inmates from participating in educational and vocational programs based on some alleged prison policy. Without the benefit of knowing whether such a policy existed then or exists now, this court cannot address the merits of this claim. It is well-settled that parties cannot rest on mere allegations in the pleadings, *Boruski v. United States*, 803 F.2d 1421, 1428 (7th Cir.1986), or upon conclusory allegations in affidavits. *First Commodity Traders v. Heinold Commodities*, 766 F.2d 1007, 1011 (7th Cir.1985). Compounding the problem is that the defendants have not specifically addressed this issue in their summary judgment motion, although they have moved for summary judgment on "all" issues except the Eighth Amendment claim. Unlike plaintiff Hendrix's due process claim which involved no factual disputes, this claim appears to revolve around an alleged policy or practice that may constitute a violation of the Equal Protection Clause of the Fourteenth Amendment. Thus, the court concludes that this claim be reserved for further proceedings.

Accordingly, the plaintiffs' motions for summary judgment and judgment on the pleadings with respect to this claim should be, and hereby are DENIED WITHOUT PREJUDICE. SO ORDERED.

### E. Due Process—Inmate Funds

The plaintiffs next allege that the nonconsensual transfer of interest earned on their personal funds to the Inmates' Recreation Fund is a deprivation of property without due process in violation of the Fourteenth Amendment. They contend that a prisoner's right to own earnings, such as interest from incoming producing

property, is constitutionally protected. Additionally, the plaintiffs complain that the restriction prohibiting the withdrawal of personal funds to send to persons who are not in the immediate family of an inmate constitutes a deprivation of property without due process in violation of the Fourteenth Amendment.

Even though plaintiff James Hendrix has been transferred to a different Indiana correctional facility, both plaintiffs still have standing to challenge the constitutionality of the procedures governing inmate funds since the procedures apply to all inmates incarcerated in Indiana. This also assumes that one of the plaintiffs has funds deposited in a DOC trust account. The court does not have before it any evidence that either plaintiff has funds deposited in a DOC trust account, other than plaintiffs' mere allegations. However, reasonable inferences can be drawn from plaintiff Hendrix's affidavit that he had, and may still have, personal funds deposited in a DOC trust account. Plaintiffs' Motion for Judgment on the Pleadings, Hendrix Affidavit ¶ 7.

Both the plaintiffs and defendants have moved for summary judgment on the deprivation of property claims. For the reasons that follow, the court concludes that defendants are entitled to summary judgment as a matter of law with respect to these claims.

### 1. Transfer of Interest to the Inmates' Recreation Fund

■ Plaintiffs first complain that they have a constitutional right to interest earned on their trust accounts. Indiana law provides that an inmate's personal funds be held in trust by the correctional institution in which the inmate is confined. Ind.Code Ann. § 4-24-6-2 (West 1981). This trust, commonly known as the Inmate Trust Fund, is a form of institutionalized checking account. DOC holds in trust all personal funds of an inmate which are in the physical possession of the inmate at the time of incarceration. Defendants' Answers to Plaintiffs' Interrogatories, Defendant Daniel F. Evans, Jr., Answer No. 12—DOC Policy Statement 3-01-107. Further-

more, DOC holds in trust all personal funds deposited with DOC for the use and benefit of, or belonging to the inmate. *Id.;* Ind. Code § 4-24-6-2.

Indiana statutes further provide that "[a]ny interest or income derived from the deposit or investment of funds held in trust for any ... inmate, *shall* be transferred from such trust fund to a special fund to be known as the ... 'inmates' recreation fund'...." Ind.Code Ann. § 4-24-6-4 (West Supp.1988) (emphasis added). At the discretion of the correctional institution, the funds in the Inmates' Recreation Fund shall be used for the direct benefit of persons who are inmates in such institution. Ind.Code Ann. § 4-24-6-6 (West 1981). The funds are typically used to purchase recreational supplies for the inmates. *Id.*

The Fourteenth Amendment prohibits the states from depriving a person of property without due process of law. Prisoners are protected by the Due Process Clause, see *Hudson v. Palmer,* 468 U.S. 517, 539, 104 S.Ct. 3194, 3206, 82 L.Ed.2d 393 (1984), and they may vindicate their property rights in § 1983 actions, see *Kimbrough v. O'Neil,* 545 F.2d 1059, 1061 (7th Cir.1976) and *Carroll v. Sielaff,* 514 F.2d 415, 417 (7th Cir.1975). It is axiomatic that property interests protected by the Due Process Clause must be found in state or federal law. *Board of Regents v. Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. It is also not disputed that property interests "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *Id.* If a protected property interest is identified under state law, a determination must then be made as to what process is due. *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed. 2d 18 (1976). Thus, this court must decide whether Indiana law provides the plaintiffs with a protected property interest and, if so, what process is due.

Assuming they have standing, plaintiffs clearly have a property interest in their personal funds on deposit in the Inmate Trust Fund. *See Campbell v. Miller,* 787

F.2d 217, 222 (7th Cir.1986), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986). The difficult question is whether they have a property interest in the interest earned on their personal funds on deposit in the Inmate Trust Fund. As previously discussed, all funds in the inmate's possession upon entry to a correctional facility are deposited into the trust fund. Ind.Code § 4–24–6–2; *see also* DOC Policy Statement 3–01–107. Furthermore, all other funds to be used for the benefit of an inmate while incarcerated are deposited into the trust fund. *Id.* Interest accrues on the funds deposited in trust, and it is the trust that has a legal right to the accrued interest, not the inmate. Indiana law, therefore, does not provide the plaintiffs with any possessory right, actual or constructive, to the interest accrued on their inmate accounts.

In trust terms, DOC is the trustee of these personal funds and the plaintiffs are the beneficiaries. Thus, upon their release, the plaintiffs will receive the corpus, that is, the amount on deposit in their personal accounts. As beneficiaries, they have no legal right to the accrued interest since all income accruing in the trust *shall* subsequently be transferred to the Inmates' Recreation Fund. Ind.Code § 4–24–6–4.

In not denying that either plaintiff has funds deposited in a DOC trust account, the defendants cite three district court decisions in which the courts have found that the Constitution does not create a right to earn interest on personal funds while incarcerated. In *X (Smith) v. Robinson,* 456 F.Supp. 449 (E.D.Pa.1978), the district court concluded that there is no right, under any aspect of the Due Process Clause, to earn interest on monies received while incarcerated. *Id.* at 454. In *Bijeol v. Benson,* 404 F.Supp. 595 (S.D.Ind.1975), District Judge James E. Noland found that a federal prisoner has no constitutional right to draw interest on his commissary account. *Id.* at 599. Lastly, in *Gray v. Lee,* 486 F.Supp. 41 (D.Md.1980), *aff'd,* 661 F.2d 921 (4th Cir.1981), the district court concluded that refusal to pay interest on inmate funds did not deprive inmates of property without due process "[i]nasmuch as

prisoners may transfer funds from their spending account to a 'free-world' interest bearing savings account...." *Id.* at 45. Plaintiff Hendrix alleges that the defendants prohibit inmates from transferring funds from their trust accounts to a free-world interest-bearing savings account. Plaintiffs' Motion for Judgment on the Pleadings, Hendrix Affidavit ¶ 7. However, this court still maintains that the plaintiffs do not have a property interest under Indiana law in the interest earned on their personal funds. Furthermore, the plaintiffs can transfer their personal funds to a family member who can deposit the funds in a free-world, interest-bearing bank account, thus avoiding the apparent concerns with this fact as expressed by the court in *Gray v. Lee,* 486 F.Supp. at 45.

On the contrary, plaintiffs rely on *Eubanks v. McCotter,* 802 F.2d 790 (5th Cir. 1986) and *Morrison v. LeFevre,* 592 F.Supp. 1052 (S.D.N.Y.1984). Neither case held that there is a constitutional right to interest earned on inmate accounts. Additionally, they rely on two unreported cases supporting their claim. Without the benefit of copies of these unpublished decisions, this court cannot grant plaintiffs this relief.

The court, therefore, concludes that the plaintiffs have no property right under state law to the interest earned on their personal funds deposited in the Inmate Trust Fund. It follows, therefore, that they have not been deprived of a protected property interest without due process of law.

*2. Restrictions on Withdrawals*

■ Plaintiffs also contend that the restriction prohibiting the withdrawal of personal funds to send to persons who are not in their immediate family deprives them of their property without due process of law. DOC Standard Operating Procedure (SOP) # 205 provides that an inmate may withdraw personal funds from the Inmate Trust Fund to: (1) send to an immediate family member; (2) pay a legitimate debt; and (3) purchase authorized items. Plaintiffs' Motion for Judgment on the Pleadings, Exhibit.

This court must first determine whether the merits of this claim should be addressed. Defendants contend that there is no claim that either plaintiff attempted to or desired to send money to a person who is not in their immediate family. This court is reluctant to determine the merits of a claim where the plaintiffs apparently have no standing. However, the plaintiffs are proceeding *pro se* and, in the spirit of *Haines v. Kerner, supra,* this court will give them the benefit of any doubt. In the interest of caution, therefore, the court will address the merits of their claim.

As discussed previously, it is not disputed that the plaintiffs have a property interest in their personal funds, see *Campbell v. Miller,* 787 F.2d at 222. Furthermore, this court considers that the placement of an inmate's personal funds in a trust fund is a form of deprivation, especially in light of SOP # 205 which restricts the types of withdrawals. It is a deprivation of actual possession, leaving the inmate with constructive possession. The Eighth Circuit in *Sell v. Parratt,* 548 F.2d 753 (8th Cir.1977), *cert. denied,* 434 U.S. 873, 98 S.Ct. 220, 54 L.Ed.2d 152 (1977) has analyzed such a situation:

> Granting that the prison authorities had the right to deprive the plaintiffs of the immediate actual possession and enjoyment of the funds in question, the exercise of that right did not necessarily destroy the right of the plaintiffs to have the funds deposited to their accounts on the prison books or held for ultimate return to them and *thus remain in their constructive possession.*

*Id.* at 757 (emphasis added). Additionally, the trust fund can be viewed as a form of temporary deprivation since the inmate will eventually receive the deposited funds upon release.

Irrespective of the form of deprivation which occurs from the operation of the Inmate Trust Fund and SOP # 205, due process clearly has been satisfied in that inmates have more than adequate control over the use of their personal funds. The touchstone of due process analysis is the balancing of competing interests. *See*

*Wolff v. McDonnell,* 418 U.S. at 556, 94 S.Ct. at 2974. The particular due process protections are limited by the needs to pursue legitimate correctional goals. *Id.* The defendants assert that legitimate security interests are at stake. They contend that inmates could withdraw personal funds to facilitate escape plans or to promote trafficking in contraband. Moreover, these funds could be used to bribe guards or prison employees. *Sell v. Parratt,* 548 F.2d at 756. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier,* 417 U.S. at 827, 94 S.Ct. at 2806. SOP # 205 is not an "exaggerated" response but rather an appropriate response to legitimate security concerns. *See Id.*

The interest of prison officials in the security of their prisons clearly outweighs any interest that the plaintiffs have in being able to freely withdraw their personal funds to send to a person who is not in their immediate family and who is not owed a legitimate debt. Furthermore, SOP # 205 provides the plaintiffs with more than adequate control over the use of their personal funds. They can withdraw funds to pay immediate family members, to pay legitimate debts, and to make authorized purchases. "Due process rights are not infringed when the imposition in question is reasonably related to a legitimate governmental purpose." *Martin v. Tyson,* 845 F.2d 1451, 1458 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988) (citing *Bell v. Wolfish,* 441 U.S. 520, 538, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979)). The restriction in SOP # 205 prohibiting the withdrawal of personal funds to send to persons who are not in the immediate family of an inmate is reasonably related to legitimate security concerns. Therefore, SOP # 205 does not deprive the plaintiffs of their property without due process of law.

For the foregoing reasons, the court concludes that no genuine issue of material facts exist with respect to either deprivation of property claim and that defendants are entitled to judgment as a matter of law. Accordingly, the defendants' motion for summary judgment with respect to these claims should be and hereby is GRANTED. SO ORDERED.

### F. Equal Protection—Inmates' Recreation Fund

■ The plaintiffs finally allege that the defendants deny K–Dormitory inmates the benefit of recreational supplies while providing these same supplies to prisoners confined inside the prison. Plaintiff Gerald Cobbs alleges that once he was advised by prison officials that recreational supplies ordered through the Inmates' Recreation Fund were to be provided for maximum security, in-custody inmates only. Complaint at 17–18. He was further advised that maximum security, out-custody inmates (K–Dormitory inmates) would have to purchase their own recreational supplies. *Id.* The plaintiffs argue that they are being denied equal protection guaranteed by the Fourteenth Amendment. The defendants have not denied that this incident occurred or that such a practice exists.

Both plaintiffs and defendants have moved for summary judgment on this claim. As previously discussed, plaintiff James Hendrix no longer has standing to seek relief. However, it is undisputed that plaintiff Gerald Cobbs was confined in K–Dormitory when he attempted to obtain recreational supplies. Furthermore, he is presently confined in K–Dormitory. Thus, he still has standing to argue this claim.

The defendants first insist that this court lacks subject matter jurisdiction to review this claim by reason of the Eleventh Amendment. They claim that the recreation fund is a matter of state law; therefore, this court lacks subject matter jurisdiction to review the expenditures or operation of the fund. *See Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Granting that the recreation fund is a matter of state law, this court is not going to grant defendants summary judgment on the basis of subject matter jurisdiction when plaintiff Cobbs is claiming injuries allegedly sustained in violation of a federal constitutional right. *See Williams v. Lane,* 851 F.2d at 883.

The Equal Protection Clause of the Fourteenth Amendment protects the disparate treatment of prisoners. "Unequal treatment among inmates, however, is justified if it bears a rational relation to legitimate penal interest." *Id.* at 881 (citing *Hudson v. Palmer,* 468 U.S. at 522–523, 104 S.Ct. at 3197–98). Defendants rely on this circuit's decision in *French v. Owens,* 777 F.2d 1250 (7th Cir.1985), *cert. denied,* 479 U.S. 817, 107 S.Ct. 77, 93 L.Ed.2d 32 (1986) to support their argument that there is no constitutional right to equal access to recreation as between different categories of inmates. *French* involved protective custody inmates at the Indiana Pendleton Reformatory who claimed they were denied equal access to vocational, academic and rehabilitation programs. This circuit found that security reasons justify limiting the access of prisoners in protective custody to rehabilitative programs. *Id.* at 1256. Security concerns, therefore, can justify the disparate treatment of a class or group of inmates.

Security concerns, however, have not been raised by the defendants in their summary judgment motion. Rather, the defendants appear to justify the denial of recreational supplies to plaintiff Cobbs and K–Dormitory inmates on the basis of fiscal concerns. They contend that DOC must determine how to best expend their funds for the benefit of the greatest number of offenders—those offenders housed inside the prison walls. Fiscal concerns, like security concerns, are considered legitimate penal interests. *See, e.g., Martinelli v. Dugger,* 817 F.2d 1499, 1506–1507 (11th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 714, 98 L.Ed.2d 664 (1988) (prison authorities can make reasonable attempts to balance a prisoner's freedom of religion with the goal of avoiding excessive administrative expense); *Bach v. Coughlin,* 508 F.2d 303, 307–308 (7th Cir.1974) (prison au-

**914**

thorities can make reasonable attempts to balance a prisoner's right of access to the courts with prison budgetary considerations); *Walker v. Blackwell*, 411 F.2d 23, 26 (5th Cir.1969) (considerations of administrative expense outweigh prisoner's right to a religious diet).

Plaintiff Cobbs is not contending that he was denied recreational supplies. It is undisputed that K–Dormitory inmates have access to such supplies if they purchase them. Rather, he is contending that he was denied free recreational supplies paid for from the Inmates' Recreational Fund. Whatever interest plaintiff Cobbs has in free recreational supplies is far outweighed by the prison's interest in determining how to best expend the recreation fund for all prisoners. This is in light of the fact that the number of prisoners in K–Dormitory is substantially less than the number of prisoners housed inside the prison walls. In view of these considerations, the court concludes that the defendants did not violate the equal protection rights of plaintiff Cobbs nor does the alleged practice of denying K–Dormitory inmates free recreational supplies.

For the foregoing reasons, the court concludes that no genuine issue of material facts exist with respect to this claim and that defendants are entitled to judgment as a matter of law. Accordingly, the defendants' motion for summary judgment with respect to this claim should be, and hereby is GRANTED. SO ORDERED.

## V.

### Conclusion

Plaintiffs' motions for summary judgment and judgment on the pleadings with respect to Gerald Cobbs' equal protection claim on the denial of academic and vocational training are hereby DENIED WITHOUT PREJUDICE. This claim, along with plaintiffs' Eighth Amendment claim, is reserved for further proceedings. Defendants' Cross–Motion for Partial Summary Judgment with respect to all other claims

raised by plaintiffs is hereby GRANTED. IT IS SO ORDERED.